# Elyton Land Co. *v.* Birmingham Warehouse and Elevator Co.

*Bill in Equity by Judgment Creditor of Corporation, to enforce Individual Liability of Stockholders.*

1. *Payment of subscription for stock in property.*—Under constitutional and statutory provisions (Const. Art. xiv, §§ 6, 8; Code, 1876, § 1805; Code, 1886, § 1662), when a subscription for stock in a corporation is made payable in property, the property must be taken at its reasonable money value; and though a margin will be allowed for an honest difference of opinion as to its value, a valuation grossly excessive, knowingly made, while its acceptance may bind the corporation, is a fraud on creditors, and they may proceed against the stockholders individually as for an unpaid subscription.

2. *Same; estoppel against creditor.*—A person who actively participated in securing the organization of a corporation with a view of making a sale of property to it, and who in fact accepted benefits in his dealings with it, with full knowledge that the stock subscribed was to be paid for by a conveyance of the property at a grossly excessive valuation, may be estopped from disputing the validity of the transaction, or proceeding against the stockholders individually; but the principle can not be extended to a vendor, who, having agreed to sell a tract of land to a corporation then being organized, executed a bond to one of the projectors as trustee for it, reciting therein that he had paid $5,000, about one-tenth of the purchase-money, that he

| 92 | 407 |
| 94 | 363 |
| 94 | 645 |

| 92 | 407 |
| 96 | 250 |
| 96 | 368 |

| 92 | 407 |
| 99 | 75 |

| 92 | 407 |
| 102 | 654 |

| 92 | 407 |
| 103 | 102 |

| 92 | 407 |
| 115 | 238 |

| 92 | 407 |
| 118 | 359 |
| 119 | 276 |

| 92 | 407 |
| 123 | 874 |

| 92 | 407 |
| 137 | 146 |

| 92 | 407 |
| 143 | 578 |

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

was to transfer it to the corporation when fully organized, that the corporation should then execute its notes for the balance of the purchase-money, and conditioned that a conveyance should be executed to it on payment of the notes; and who, having obtained judgment against the corporation on the unpaid notes, seeks to enforce an individual liability against the stockholders, as for unpaid subscriptions, because the entire capital stock of the corporation, $200,000, was taken as satisfied by their conveyance of the land, for which only $5,000 had been paid.

APPEAL from the Chancery Court of Jefferson.
Heard before the Hon. THOMAS COBBS.

ALEX. T. LONDON, for appellant, rests his contention, that the chancellor erred in sustaining the demurrers, upon the following propositions, and authorities: 1. Subscriptions to the capital stock of a corporation constitute a trust fund for the benefit of creditors, which neither the corporation, nor its directors, can dispose of or waste to their prejudice, and any agreement to that effect is void against creditors.—*Smith v. Huckabee*, 53 Ala. 191; *M. & W. P. R. R. v. Branch*, 59 Ala. 139; *Sanger v. Upton*, 91 U. S. 60; *Scovill v. Thayer*, 105 U. S. 143. 2. Creditors may enforce this liability.—Taylor on Corporations, 660; Cook on Stockholders, Sec. 42; *Smith v. Huckabee, supra; Scovill v. Thayer*, 105 U. S. 143. 3. Where property is transferred in payment of subscriptions, it must be at its fair cash value.—1 Morawetz on Corporations, Sections 425, 426, 427, 428; 2 *Id.* Section 825 and cases cited; *Weatherbee v. Baker*, 35 N. J. Eq. 501, 513; Taylor on Corporations, Sections 545, 701, *et seq.*; *Osgood v. King*, 42 Iowa, 478; *Jackson v. Taber*, 64 *Id.* 469, 477; *Bailey v. Pittsburg Co.*, 69 Pa. St. 334. 4. By our statute, property can only be subscribed at its money value.—Code of 1876, Sec. 1805. 5. Where property is transferred in payment of a subscription at an over-valuation, and such over-valuation is intentional, this makes it fraudulent as against creditors.—Cook on Stockholders, Sections 44, 47, 48; Authorities cited under third proposition. 6. Where the over-valuation of land or property transferred in payment of stock subscriptions is so great as to bear evidence on its face that it was intentional and fraudulent, the court will hold, unless the transaction is reasonably explained, that there is no question of fact, but as a matter of law the over-valuation was fraudulent.—Cook on Stockholders, Sec. 34, p. 31; *Boynton v. Hatch*, 47 N. Y. 225; *Lake Superior Co. v. Drexel*, 90 N. Y. 87; *Brockway v. Ireland*, 61 How. Pr., 372; *Boynton v. Andrews*, 63 N. Y. 93. 7. The rule by which it is to be determined whether the payment is fraudulent or not is the same as would apply in the purchase of prop-

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

erty.—Bump on Fraud. Con., 44; *Hoot v. Sorrell*, 11 Ala. 386; *Prosser v. Henderson*, 11 Ala. 484; *Gordon v. Tweedy*, 71 Ala. 202–213.    8. Where a party accepts a certificate and takes part in a corporation and becomes entitled to share in its profits he can not as against the creditors seeking to charge him as a stockholder for unpaid subscription, deny his liability as a stockholder.— *Ogilvie v. Knox*, 22 Howard, 380; *Hawley v. Upton*, 102 U. S. 314; *Lehman v. Warner*, 61 Ala. 455. 9. Although a subscription may be declared fraudulent as against creditors, the subscriber is not thereby discharged, but their claims are to be satisfied and the stockholders can be required to pay their stock in full.—Taylor on Corporations, Sections 545, 701; *Scovill v. Thayer* 105 U. S. 143, 154. 10. Stock issued must be based on a valuable consideration; that is, the stock should represent the fair value of assets received.—Constitution, Article XIV, Section 6; *Fitzpatrick v. Dispatch Co.*, 83 Ala. 604; *Williams v. Evans*, 87 Ala. 725; *Ewing v. Oroville Mining Co.*, 56 Cal. 649.    11. A subscription of "real property" is not "discharged by" the transfer to the corporation of the right to a conveyance of property upon payment of the purchase-money.— *Goodlett v. Hansell*, 66 Ala. 151; 2 Addison Con. (8 Ed.) bot. p. 390; *Bailey v. Pittsburg Co.*, 69 Pa. St. 334.    12. Where a stockholder fails to deliver property of the value of his subscription in discharge of it, he is liable for the subscription in money, and creditors may subject him to this liability.—*Boynton v. Hatch*, 47 N. Y. 225; *Schenck v. Andrews*, 57 N. Y. 133; *Boynton v. Andrews*, 63 N. Y. 93; *Douglass v. Ireland*, 75 N. Y. 100.    13. The decisions of the Court of Appeals of New York, cited above, construing a statute of that State of like effect with ours would be strongly persuasive in the construction of our statute. *Bedsole v. Peters*, 79 Ala. 136.    14. As against creditors a corporation can not release stockholders from any part of their subscriptions to capital stock, and an agreement to accept less than the full amount of the subscription in money or property, while binding on the corporation, is void so far as it injuriously affects creditors.    That the English rule (Cook on Stock. § 43) that such contracts, if binding on the corporation are binding on creditors, does not obtain in this country, for the reason that here, the unpaid subscriptions are a trust fund for creditors.—*Scovill v. Thayer*, 105 U. S. 143, 154; *Sawyer v. Hoag*, 17 Wall. 610; *Wood v. Dummer*, 3 Mason, 308.    15. The English rule can have no application in this State, where the liability is fixed by statute in case of failure to "deliver the property according to the terms of the subscription," that the money value thereof as named in the lists of subscription shall be paid by the subscribers.—Code, 1876, Sec. 1805.

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

GARRETT & UNDERWOOD, *contra*, submit, in support of correctness of the chancellor's decree, the .following propositions .and authorities :   1. The bill shows nothing due to the Birmingham Warehouse and Elevator Company, from Johnston, Sage, VanHoose and McLester, or either of them, either on unpaid subscriptions to stock, or otherwise.—Code of Alabama, 1876, § 1805; Cook on Stock. §§ 13, 15, 16, 34, and notes; *Phelan v. Hazard*, 5 Dill. 45 ; Thompson, Liability of Stockholders, § 134 ; *Brant v. Ehlen*, 59 Md. 1; Constitution of Alabama, Art. 14, § 8; Code of Alabama (1876), § 2023 ; *Coit v. Gold Co.*, 119 U. S. 343 ; *Scovill v. Thayer*, 105 U. S. 143 ; *Flinn v. Bagley*, 7 Fed. Rep., p. 786 ; *Coffin v. Ransdell*, 11 N. E. Rep. 20.   2. The bill alleges no facts which render Johnston, Sage, VanHoose or McLester, liable for the .alleged debt therein mentioned, as due from the Birmingham Warehouse and Elevator Company to the appellant.—Constitution of Alabama, Art. 14, § 8; Code of Alabama, 1876, § 2023 ; Cook on St., §§ 34, 36, 43, 44, Note 5, 47, Note 5 ; Authorities cited under first proposition. *New Albany v. Burke*, 11 Wall. (U. S.), 96.   3. The bill shows, that Van Hoose, Johnston, Sage and McLester subscribed for stock in the Birmingham Warehouse and Elevator Company, payable in stock at the valuation mentioned in said subscription, which property has been delivered and received in full payment of said stock, and the bill fails to show that said property was overvalued unreasonably, intentionally and fraudulently, or that appellees have made any profit from the stock so subscribed and taken by them.—Cook on Stockholders, §§ 44, 47, 26, Notes 2 and 3; *Scovill v. Thayer*, 105 U. S. 143, 156 ; *Phelan v. Hazard*, 5 Dill., 45; *Coffin v. Ransdell*, 11 N. E. Rep. 20 ; *Anderson's Case*, L. R. 7 Ch. D. 75 ; *Currie's Case*, DeG. J. & S., 367; *Van Cott v. Van Brunt*, 82 N. Y. 542 ; 1 Mor. on Cor., § 429 ; 2 *Ib.* §§ 826, 829 ; *Brant v. Ehlan*, 59 Md. 1; *Waterhouse v. Jamieson*, 2 H. of L., 29, 37 ; *Coit v. Gold Co.*, 119 U. S. 143 ; s. c., 14 Fed. Rep. 12 ; *Lake Sup. Iron Co. v. Drexel*, 90 N. Y. 87; *Carr v. LeFevre*, 27 Pa. St., 413 ; *Thurber v. Thompson*, 21 Hun. 472 ; *R. R. Co. v. Dow*, 120 U. S. 287, and citations; *Stein v. Howard*, 65 Cal. 616. 4. One of these two thing must be true :   Either the issue of the paid-up stock, as made by the Birmingham Warehouse and Elevator Company to Johnston, Sage, McLester and VanHoose, was within the prohibitions of the Constitution, Art. XIV., Sec. 6, and of the Code of 1876, Sec. 1816, or it must have been made in full compliance with their requirements.   In the latter case, the stock in the hands of Johnston, Sage, McLester and VanHoose, is valid stock, issued for "money or property actually

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

received," and is "fully paid, according to the terms of subscription," and the subscribers are no further liable thereon. If this be not true, the issue is in violation of the direct, positive prohibitions of both the Constitution and the Code, and was and is therefore void. The issue of this stock was the *sole consideration* of the subscriptions therefor, by Johnston, Sage, McLester and VanHoose; and therefore, under the well settled law in this State, those subscriptions were void, and the subscribers can not be held liable thereon, even though they remain unpaid.—*Farrior v. N. E. Morty. Sec. Co.*, 88 Ala. 275; *Dudley v. Collier*, 87 Ala. 431, and citations; *McGehee v. Lindsey*, 6 Ala. 16, and citations; *Williams v. Evans*, 87 Ala. 725.

WALKER, J.—The bill was filed by the Elyton Land Company as a judgment creditor of the Birmingham Warehouse and Elevator Company, a corporation, and its purpose is to secure the payment of the judgment by the enforcement of the alleged unsatisfied liability of the individual defendants as original subscribers to the stock of the defendant corporation. It is averred that said individual defendants pretend that they have discharged and satisfied their liability as such subscribers, but it is alleged that the transaction whereby it was attempted to discharge that liability is merely colorable and is void, as against the creditors of said corporation, and that said subscribers are liable to pay in money the amount of their said subscriptions or so much thereof as is necessary to satisfy said judgment. The following is the substance of the case stated by the bill: On the 9th day of March, 1887, the Elyton Land company executed and delivered to the defendant J. A. VanHoose as trustee for the Birmingham Warehouse and Elevator Company, a corporation then in process of organization, its bond of title for two blocks of land near the city of Birmingham, to be paid for at the price of fifty-three thousand dollars. Said VanHoose paid to the Elyton Land Company five thousand dollars on the execution and delivery of the bond for title, by the terms of which it was provided that he was to execute a transfer and conveyance of his rights and interests thereunder to the Birmingham Warehouse and Elevator Company upon its organization, and that that company should make its nine notes for the balance of the purchase-money to the Elyton Land Company, said notes to be each for $5,333.33, bearing interest from August 20th, 1886, payable respectively at 1, 2, 3, 4, 5, 6, 7, 8, and 9 years from that date. On the 19th day of February, 1887, said VanHoose and the other individual defendants, Johnston, Sage and McLester, filed their petition in the office of the probate judge of Jefferson county

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

for the organization as a corporation of the Birmingham Warehouse and Elevator Company, the capital stock of which was to be fixed at two hundred and fifty thousand dollars, to be divided into twenty-five hundred shares of one hundred dollars each. On the same day a commission was issued to said VanHoose, Johnston, Sage and McLester, constituting them a board of corporators and authorizing them to open books of subscription to the capital stock of the proposed corporation. On the 11th day of March, 1887, said board of corporators over their signatures reported and certified to said probate judge that on the 9th day of March, 1887, they had opened books of subscription to the stock of said proposed corporation and that they had each subscribed for five hundred shares, "subscribed through James A. VanHoose, trustee for the subscribers, and payable in real property near the city of Birmingham, . .. . . of the money value stated in said subscription of two hundred and fifty thousand, one hundred and thirty-three dollars and thirty-three cents, subject to the unpaid purchase-money due to the Elyton Land Company amounting to fifty thousand one hundred and thirty-three dollars and thirty-three cents, the payment of which is to be assumed by said company, said lands being fully . described in the bond for titles of the Elyton Land Company to said James A. VanHoose, trustee, dated March 9th, 1887, which said trustee is to convey to said company in payment of said two thousand shares of stock," and VanHoose, Johnston, Sage and McLester each subscribed for one share payable in money. Said corporators further reported, that on the organization of said company, said VanHoose, Johnston, Sage and McLester were present and each represented in person five hundred and one shares in stock; that each of said persons was elected a director of said corporation, and that the board of directors elected VanHoose as president and McLester as treasurer and secretary of the corporation. It was further reported and certified by the corporators that on the 10th day of March, 1887, after the organization of said company, all the capital stock thereof payable in money was paid to the treasurer and all the property subscribed was delivered to him. The subscriptions were made as reported and certified by the corporators. It was not true at the time of the filing of the bill, or when the subscriptions were made and reported, that said land was of the money value of two hundred thousand dollars. The price named in said bond for title, fifty-three thousand dollars, was at the time of said subscriptions the full money value of said land when sold on long credit. Said VanHoose, Johnston, Sage and McLester well knew that said land was

not worth, nor was it of the money value of, two hundred thousand dollars or anything near that sum. After said subscriptions were made, and after said Birmingham Warehouse and Elevator Company was organized, said VanHoose endorsed to it said bond for title, and said company executed its nine promissory notes as, by the terms of the bond for title, it was provided it should do; and said VanHoose, Johnston, Sage and McLester now claim that the assignment of said bond was a discharge and satisfaction of said subscription of two hundred thousand dollars, which has not been otherwise paid. It is this transaction which the bill alleges is merely colorable and is void as against the creditors of said corporation. Only five thousand dollars has been paid on account of said purchase-money. The Elyton Land Company has recovered judgment against said Birmingham Warehouse & Elevator Company on two of said notes. That judgment remains unsatisfied, and said corporation has no property out of which it could be satisfied by execution.

Each of the individual defendants demurred to the bill upon the following, among other grounds: 1. That the bill on its face shows that the complainant has no right to the relief therein prayed because it shows that this defendant owes nothing to the Birmingham Warehouse & Elevator Company, either in unpaid subscriptions for stock or otherwise; 2. Because said bill alleges no facts which render this defendant liable personally in any way for the alleged debt mentioned therein as due from said Birmingham Warehouse & Elevator Company to the complainant; and, 3. Because said bill shows that this defendant subscribed for stock in said Birmingham Warehouse & Elevator Company payable in property at a valuation mentioned in said subscription, which property has been delivered and received in full payment for said stock, and said bill fails to show that said property was over-valued unreasonably, intentionally and fraudulently, or that the defendant has made a profit from the stock so subscribed and taken by him. A decree was rendered sustaining the demurrers as to the grounds here mentioned. The appeal is from that decree.

On the averments of the bill it is to be taken as true that the property which was received by the corporation as full payment of the stock subscription was worth only five thousand dollars, the amount which had been paid on the bond for title. It follows that the decree of the Chancery Court involves the assertion of the validity, as against the creditors of the corporation, of the payment of a stock subscription of two hundred thousand dollars by the transfer to the corporation of property

worth only five thousand dollars. In reviewing this determination regard is to be had to certain constitutional and statutory provisions which are to be construed and applied in the light of settled principles governing the relations of stockholders to the corporation of which they are members, and to the creditors thereof. By the Constitution of 1875 it was provided, that "no corporation shall issue stock or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void;" and that "dues from private corporations shall be secured by such means as may be prescribed by law, but in no case shall any stockholder be individually liable otherwise than for the unpaid stock owned by him or her."—§§ 6 and 8 of Article XIV of the Constitution. Prior to the adoption of the present Constitution each stockholder in any corporation was liable to the amount of stock held or owned by him, the law imposing a liability not only to the extent that the stock was unpaid, but for an additional sum equal to the amount of such stock.—§ 3, Art. XIII of the Constitution of 1868; § 1760, Revised Code of 1867; *McDonnell v. Gold Life Ins. Co.,* 85 Ala. 401. Before the creation of this additional liability, the stock and other property of a private corporation was regarded and treated in a court of equity as a trust fund for the payment of the debts of the corporation, and in the event of the insolvency of the corporation, unpaid stock subscriptions could be condemned for the satisfaction of the creditors; and said additional liability was a mere increase of the security for the payment of the corporate debts.—*Smith v. Huckabee,* 53 Ala. 191. While corporate creditors were secured by this special liability existing in their favor there was no direct constitutional or general statutory prohibition against the abuse of corporate powers by the issue of stock not in good faith representing the value of money, services or property actually contributed to the corporate enterprise; and the general incorporation law then in force contained no requirements as to the mode of subscribing for stock, or as to how the subscription liability should be satisfied.—Chapters 3 and 4, Title 2, Part 2, of Code of 1867. The dangers to which corporate creditors were exposed by the absence of such regulations were obviated by the provisions for said additional liability. When those provisions were repealed by the Constitution of 1875, there was an obvious necessity of providing that the trust fund, the remaining security for corporate creditors, should exist as a thing of substance, and that the liability for unpaid stock should not be merely illusory. This necessity was not overlooked. The former legislative policy of securing corporate creditors by

making the stockholders liable to them in amounts over and above what they could be called upon to pay on their stock subscriptions gave place to a new policy the aim of which was to afford proper security to persons dealing with corporations by prohibiting the issue of stock except for value received by the corporation, and by providing definite regulations for the payment of stock subscriptions in money, or in labor or property at its money value. This new policy is evidenced generally by section 6 of Article XIV of the Constitution, quoted above, and particularly as to manufacturing, mining, immigration and industrial business corporations, by section 1805 of the Code of 1876, which provides that "all subscriptions to the capital stock of any company organized or proposed to be organized under the provisions of this article shall be made payable in money, or in labor or property at its money value, to be named in the list of subscription, and in case of a failure to perform the labor, or deliver the property, according to the terms of the subscription, the money value thereof as named in the lists of subscription, shall be paid by the subscribers." These enactments are not for the benefit of corporate creditors alone. The policy evidenced thereby bears upon the relations of corporations to the public and upon the relations of stockholders to each other, to the corporation and to its creditors. This court has not heretofore had occasion to pass upon the question as to the effect of these provisions upon the rights of corporate creditors. The effective operation of the constitutional provision in other connections has been recognized in several cases. In *Fitzpatrick v. Dispatch Publishing Co.*, 83 Ala. 604, it was held, at the instance of an objecting stockholder, that under the constitutional and statutory provisions a corporation with a paid-up capital of ten thousand dollars has no authority to double its capital stock and distribute the new stock among its stockholders as a stock dividend, on the mere statement that its capital stock "has been invested in property which has more than doubled in value and is now worth twenty thousand dollars over and above all liabilities;" and an injunction was issued to restrain and enjoin the corporation from carrying into effect a resolution which had been adopted by the stockholders for the issue and distribution of such new stock. In the course of the opinion it was said: "Let us not, by timid interpretation, impair the strength of this bulwark, erected by our constitution-makers against the frauds which have become the reproach of the age we live in." In *Williams v. Evans*, 87 Ala. 725, it was held, that relief could not be granted on an executory contract to pay for the transfer of a subscriber's right under a stock subscription where-

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

by it was provided that the corportion to be formed should issue "five dollars of stock for one dollar of subscription." The stock had not been issued when the contract in suit was made. The court said : "A contract which contemplates the violation of a statute, or a constitution, as a mode of executing such contract, is illegal and void. . . One of the purposes of this clause of the Constitution was to protect the public, as well as stockholders, against spurious and worthless stock by the process of *watering*—in other words, from fraudulently issuing and putting on the market fictitious corporate stock, which is based on nothing valuable as a consideration for its issue. It is greatly to the interest of the public that the policy of this provision should be enforced." In *Parsons v. Joseph,* decided during the present term, and reported in 8 So. Rep. 788, the bill, to which a demurrer was overruled, was filed by a stokholder to secure the cancellation of certain certificates of stock issued to another stockholder, on the ground that the stock so issued was fictitious and that its issue was in violation of the Constitution and the statute law of the State. It was alleged that certain stock was paid for in full by conveying to the company thirty-nine acres of land at an agreed price and valuation of $137 per acre, when the land was not worth more than $25 per acre; that afterwards the capital stock of the company was doubled, and without further consideration than the thirty-nine acres of land, the amount of stock issued therefor was doubled. The contention was in regard to this latter issue of stock. It was alleged that the excessive valuation of the land was made knowingly, willfully, and with the fraudulent intent of having the fictitious stock in question issued in violation of law. On these averments it was held, that the stock in question was issued in violation of section 1662 of the Code of 1886, and of section 6, Art. XIV of the Constitution. It is to be observed that the respective requirements of section 1805 of the Code of 1876 and section 1662 of the Code of 1886 as to how stock subscriptions shall be payable, differ in this, that the former requires the subscriptions to be made payable in money, or in labor or property, at its money value, to be named in the list of subscription ; while the latter provides that all subscriptions must be payable in money, but the commissioners may receive subscriptions payable in money, the subscriber having the privilege of discharging the same by the rendition of stipulated necessary services, or the performance of stipulated necessary labor for the corporation, at the reasonable value of such services or labor, or in property, at the reasonable value thereof. It does not seem, however, that the variations in the terms of these two statutes are such, that the fact that the

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

stock subscription was made under the one or the other of them would make any substantial difference in the right of a stockholder to object to the issue of other stock representing property received by the corporation at an excessive and fraudulent over-valuation. In the case last cited it was suggested that stockholders who knowingly and intentionally have subscribed and paid for stock with property upon a fictitious valuation are liable to creditors as stockholders who have not paid up in full for their stock; but the question of such liability was not presented in that case. In *Tutwiler v. Tuscaloosa Coal, Iron & Land Co.*, 89 Ala. 391, several questions that might arise from the issue of stock for property taken at a palpably excessive valuation were stated, but not decided. It is plain from this review of the decisions that the constitutional and statutory provisions in question are treated as effectual to prevent the courts from lending their aid for the enforcement of any contract or obligation the execution of which involves a disregard of those regulations, and that so far as they are appropriate for the protection of stockholders from improper discriminations in accepting payments for stock, those regulations are accorded such effect and operation as to fully accomplish this purpose of their enactment. It can not be doubted that the protection of the interests of corporate creditors is as much within the aim and policy of those regulations as were the objects in behalf of which they have been successfully invoked in this court. In considering the claim of corporate creditors to hold the stockholders of the corporation individually liable on the ground that an attempt by them to satisfy their stock subscriptions by the transfer to the corporation of property at a gross over-valuation was not such payment as the law requires, the fact is not to be lost sight of that the solution of the question is dependent in some measure at least upon constitutional and statutory provisions which the court has already construed as amply effectual to secure the accomplishment of other objects also within the purview of the enactments. And it may be added that a like beneficial operation should be accorded to those provisions when invoked in furtherance of either of their manifest purposes.

It is impossible to reconcile the decisions of the various courts upon the question of the liability to the creditors of the corporation of stockholders, on stock issued for property taken at an over-valuation. We will briefly consider the cases principally relied on to support the proposition that such liability can not be maintained. In *Coit v. Gold Amalgamating Co.*, 119 U. S. 343, the liability was claimed on the ground that the stock was paid for in property at a valuation illegally and

fraudulently made at an amount far above its actual value.
The court found that this claim was not sustained by the evi-
dence. It was said in the opinion: "The corporators may
have placed too high an estimate upon the property, but the
court below finds that its valuation was honestly and fairly
made; and there is only one item, the value of the charter
privileges, which is at all liable to any legal objection. But if
that were deducted, the remaining amount would be so near
the aggregate capital, that no implication could be raised
against the entire good faith of the parties in the transaction."
It is plain that this case is not an authority against the exist-
ence of the liability contended for by appellant. In *Brant v.
Ehlen*, 59 Md. 1, there was no assertion of the absence of such
liability. It was expressly stated in the opinion that the ques-
tions presented were dealt with upon the assumption that the
sale and purchase of the lands, which were paid for in stock, were
made in good faith. Another case decided subsequently and
reported in the same volume, *Crawford v. Rohrer*, 59 Md. 599,
shows clearly the rule prevailing in that State on the subject
under consideration. In that case it was decided that "any
arrangement among stockholders, or those in charge of the
affairs of the corporation, by which the stock is but nominally
paid for, whether in money or property, the corporation not
in fact getting the benefit of the price in good faith, will
be regarded as a sham, and not as a valid payment, as
against the creditors of the corporation, however it may be
regarded as between the corporation and the subscriber." In
*Carr v. LeFevre*, 27 Pa. St. 413, a stockholder was sought to be
charged on stock which had been paid for in land. It was said
in the opinion: "There is nothing in the special verdict tend-
ing to show that there was any fraud in this transaction;" and
that "the parties took the precaution to have the lands valued
and appraised. We are bound to presume that this was fairly
done." The element of gross over-valuation was lacking in that
case. In this particular it was like the Alabama case of *Davis
v. Montgomery Furnace and Chemical Co.*, decided during the
present term and reported in 8 So. Rep. 496. In *Van Cott v.
Van Brunt*, 82 N. Y. 535, it appeared that stock and bonds
of a railroad company were issued to a contractor for the
building of the road, and that the work done under the con-
tract was of less value than the par of the stock and bonds
agreed to be paid therefor. By this arrangement the stock
was disposed of in good faith and without fraud, though for
less than its face value. It was held that the liability of the
stockholder had been discharged. On page 542 of the opinion
it is made to appear that the transaction was without the

influence of statutes in that State somewhat similar to pro-
visions prevailing here, as will be shown by references to be
made to other New York decisions. This case has several
times been the subject of unfavorable comment.—Taylor on
Corporations (2d Ed.), § 545, n. 5; 2 Morawetz on Private
Corporations, § 826; Cook on Stock and Stockholders, § 47,
n. 6; *Jackson v. Traer*, 64 Iowa, 483. *Phelan v. Hazard*,
5 Dillon, 45, was a suit by a creditor to charge a transferee of
stock, who had purchased the same for value and in good faith
as full paid stock. It was said that a liability could not be
established against the defendant by showing that the prop-
erty conveyed to the corporation in payment for the stock was
not worth the amount of the stock, or that it was not worth
anything over and above the mortgages upon it at the time of
the transfer. The court held that the agreement whereby
property was received in payment for the stock was conclusive
upon the company and its creditors, until by direct attack it
has been impeached and rescinded for fraud; and it was said
that "the courts, even where the right of creditors are involved,
will treat that as payment which the parties have agreed
should be payment." This case was followed as authority in
*Coffin v. Ransdell*, 110 Ind. 417. The three cases last cited
represent the weight of American authority opposed to the
recognition of the liability asserted in the case at bar. It is
to be remarked that in neither of those cases were any statu-
tory provisions mentioned as having any bearing upon the
conclusions reached. It is also to be noted, that in the latter
two of the three cases, English decisions were principally
relied on as authority. The opinions in both those cases
quote with approval from *In re* Baglan Hall Colliery Co.,
L. R. 5 Ch. App. 346, where it was said, in reference to the
right of a creditor to question the payment for stock by a
transfer of property at an over-valuation, that "the test to be
applied is this: Could the company by any proceeding have
set aside the transaction?" The English rule seems to be that
the creditor can have no other or greater rights in this regard
than the corporation itself could assert. In this country, on
the contrary, the best authorities maintain that arrangements
to issue stock as full paid, though only partly paid for in fact,
may be valid and binding between the company and its stock-
holders, and yet may be set aside at the instance of creditors,
and full payment on the stock enforced for the satisfaction of
the debts of the corporation.—*Scovill v. Thayer*, 105 U. S.
143; *Curry v. Woodward*, 53 Ala. 371. This latter rule results
from the doctrine well established in America, that the stock
subscribed is considered in equity as a trust fund for the pay--

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

ment of creditors.— *Wood v. Dummer*, 3 Mason, 308; *M. & W. R. R. v. Branch*, 59 Ala. 139; *Smith v. Huckabee*, 53 Ala. 191; *Paschall v. Whitsett*, 11 Ala. 472; *Allen v. M. R. R. Co., Ib.* 437. This doctrine, first distinctly enunciated in *Wood v. Dummer*, *supra*, does not prevail in England as in this country.—Taylor on Private Corporations, § 658, n. 1; Cook on Stock and Stockholders, § 42. The absence of the recognition in English cases of this trust feature of a subscription to stock, renders them unsafe guides in American courts when dealing with questions relating to the liability of stockholders in reference to the debts of the corporation.

Several cases are cited in support of the contention that the provision of § 6, Art. XIV of the Constitution does not have such effect on the transaction in this case as to leave the stockholders who participated therein still liable for the debts of the corporation. In *Memphis & Little Rock Railroad Company v. Dow*, 120 U. S. 287, it was held that a similar provision of the Constitution of Arkansas did not authorize a corporation itself to repudiate its liability on $2,600,000 in bonds and $1,300,000 in stock, both of which had been issued in payment for property worth only $1,300,000. This case involves no question of the right of creditors to charge stockholders. As has been already shown, an arrangement which would preclude the corporation from demanding further payment upon stock issued by it would not prevent creditors from proceeding against the stockholders if the stock has not really been paid for. Nothing is said in that case to indicate that the transaction would have been sustained to the same extent as against the creditors of the corporation. The case is not an authority against the existence of the liability here asserted. The same thing may be said of the case of *P. & S. R. R. Co. v. Thompson*, 103 Ill. 187, which is cited in the opinion in the case just mentioned. In *Stein v. Howard*, 65 Cal. 616, it was held, that an increase of capital stock, under a resolution authorizing the additional shares to be sold at 87½ cents on the dollar, was not such "a fictitious increase of the stock," as was prohibited by a constitutional provision similar to ours. Neither in this case, nor in the two cases cited just before it, is there anything in the report to indicate what, if any, statutory regulations prevailed in those States in reference to the mode in which subscriptions to stock in corporations should be made payable.

We will now turn to the principal cases which assert the invalidity as against creditors of attempts to satisfy the liability on stock subscriptions by the transfer of property at a gross over-valuation. In *Jackson v. Fraer*, 64 Iowa, 469, the

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

facts were, that a railway company had been indebted to a construction company in the sum of $70,000 which it was unable to pay, and, in satisfaction of the debt, it issued to the construction company certificates of stock of the face value of $350,000, which shares were distributed among the members of the construction company. It was held that such members were to be treated as stockholders who had paid 20 per cent. on their stock, the stock held by them being five times greater in amount than the debt for which it was issued, and that they were liable, to a creditor of the corporation, to the extent of the unpaid 80 per cent. of the par value of the stock. To the same effect is *Osgood v. King*, 42 Iowa 478. In neither of these cases does it appear that the statutes of Iowa require subscriptions to stock to be made payable in any particular mode. The existence of the liability was not made to depend upon a statutory requirement in this regard. By the New York statute governing the organization of corporations for manufacturing purposes it is provided "that the trustees of such companies may in good faith purchase property necessary to their business and issue stock to the amount of the value thereof in payment therefor, and the holders of such stock are exempt from liability for the debts of the corporation." In *Douglass v. Ireland*, 73 N. Y. 100, it appeared that the capital stock of a corporation, organized under that act, to the amount of $300,000 was issued in consideration of the assignment to the company of executory contracts for the purchase of property found by the jury to be of the value of $68,000. The defendant acquired his stock with a full knowledge of the facts, having, as a trustee of the corporation, participated in the transaction. He was held liable as a stockholder who had not fully paid up. The court said: "A deliberate and advised over-valuation of property thus purchased and paid for is a fraud upon the law, and a violation of the condition upon which the exemption of stockholders from liability under the provisions of the statute is made to depend. It is in direct violation of the policy as well as the terms of the law which demand payment, either in money or property at its value, of all the capital stock of the company, as a condition of immunity to the stockholders from liability for debts of the corporation. The payment of an amount for property in excess of its value deprives creditors and the public of the security contemplated by the statute, and thus a fraud is perpetrated as well upon the law as upon creditors. The fraud is consummated by the issue of stock as fully paid under the act of 1853, which has not been fully paid for in value by the property for which it is issued, and it does

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

not depend upon any fraudulent intent other than that which is evidenced by the act of knowingly issuing stock for property to an amount in excess of its value. All that is necessary to establish the legal fraud and take the stock issued out of the immunity assured to stock honestly issued in pursuance of the act of 1853 is to prove two facts: 1st. That the stock issued exceeded in amount the value of the property in exchange for which it was issued; and, 2nd. That the trustees deliberately, and with knowledge of the real value of the property, over-valued it, and paid in stock for it an amount which they knew was in excess of its actual value." The rule laid down in this case is firmly established in New York.—*Boynton v. Andrews*, 63 N. Y. 93; *Schenck v. Andrews*, 57 N. Y. 133; *Boynton v. Hatch*, 47 N. Y. 225; *Lake Superior Iron Co. v. Drexel*, 90 N. Y. 87. A New Jersey statute authorized payment for capital stock to be made "either in money or in land—the land to be appraised by the board of directors and taken at such value, on such terms as may be agreed on." The capital stock of a corporation was fixed at $100,000, all of which was subscribed for by five persons, who became the directors of the company. Certain lands were purchased for $50,000 and the deed thereto was made directly to the corporation which gave its obligations for the whole of the purchase-money. The directors then appraised the lands at $100,000, and credited $50,000 of that valuation as a payment of fifty per cent. on their stock subscriptions. The lands were not worth more than the original purchase price. On this state of facts it was held, in *Wetherbee v. Baker*, 35 N. J. Eq. 501, that, as against creditors of the corporation, such allowance of credit on the subscriptions was invalid, and that the stock-holders were liable for the whole amount of their subscriptions. In reference to the valuation of the land by the directors, as authorized by the statute above quoted, the court say: "The directors, in making the appraisement and valuation and dealing with their stock subscriptions, act in a fiduciary capacity, and are bound to discharge the duties of the trust with fidelity. This appraisement, it is manifest, was illusory, and made only in the interest of the directors who were to profit by it;" and that "in all such cases transactions under such powers have been upheld only where the contract for the rendition of services or the purchase of property payable in stock has been made in good faith, and the property taken in payment of stock subscriptions has been put in at a fair *bona fide* valuation; and the courts have inflexibly enforced the rule that payment of stock subscriptions is good as against creditors only where payment has been made in money or in what

may fairly be considered as money's worth. In *Bailey v. P. & C. Coal and Coke Co.*, 69 Pa. St. 334, the facts were, that Bailey, with two other persons, on September 29th, purchased certain land for $125,000, and on October 1st following the corporation agreed to take the land at an advance of $50,000, subject to the whole purchase-money, so that the stock subscription of $50,000 made by Bailey and the two others should be paid for in full by the agreed advance on the land. The statute provided that "no share shall be issued for less than its par value." It was held that by such a transaction Bailey did not pay for his stock and that he was still liable thereon. Rights of creditors were not involved in this case. The transaction was regarded as a fraud on the rights of other stockholders and as involving a non-compliance with statutory safeguards intended for the protection of the public. The case is not unlike the Alabama case of *Parsons v. Joseph*, *supra*.

The review of the authorities will not be further extended. Discussions of them may be found in Cook on Stocks and Stockholders, §§ 38 to 47; 1 Morawetz on Corporations, §§ 425 to 429; 2 *Ib.* §§ 825, *et seq.*; 2 Waterman on Corporations, § 188; Taylor on Private Corporations, §§ 545 and 701, *et seq.* Our examination satisfies us that the weight of American authority does not support the statement made by Mr. Cook, in section 47 of his work on Stocks and Stockholders, to the effect that the attempts which have been made, in cases where stock was issued for property taken at an over-valuation, to hold the party receiving such stock liable for its full par value, less the actual value of the property received from him, have been unsuccessful; and that if there has been an over-valuation which is shown to have been fraudulent, then the contract is to be treated like other fraudulent contracts, and is to be adopted *in toto*, or rescinded *in toto* and set aside. We have found no authority at all asserting the exemption of the stockholder from such liability where it appeared that the stock subscription was governed by a statutory regulation at all similar to section 1805 of the Code of 1876 or section 1662 of the Code of 1886. On the other hand, the New York, New Jersey, Maryland and Pennsylvania decisions which have been cited show that the courts in those States, in giving effect to statutory requirements, certainly no more stringent than ours, as to the mode in which stock subscriptions shall be made payable, do not allow attempted payments in property worth greatly less than the amount of the stock issued therefor to foreclose the just demands of corporate creditors to require that the stock subscriptions be made good in money or in money's worth as contemplated by the statutes. Those courts

[Elyton Land Co. v. Birmingham Warehouse & Elevator Co.]

recognize in such provisions safeguards intended for the protection of persons dealing with corporations as well as for the corporations themselves and the persons associated together therein.

Our general laws afford the amplest and freest facilities for persons desiring to engage in almost any kind of lawful venture to secure by corporate association the advantages of defined and limited responsibility and at the same time the efficient execution of their purposes by means of an artificial being, changes in the membership of which cause no break in the continuity of its action, nor affect its capacity to act, within the scope of its powers, as a natural person. It is plain that such associations, endowed with such powers and privileges, would be a source of danger to persons dealing with them, unless the law required that in their formation suitable provisions be made for a substantial responsibility for such engagements as they may enter into. When legal provisions are found which are appropriately framed to secure the existence of such responsibility it is not permissible so to construe them as to allow a mere formal and illusory compliance therewith to defeat the objects intended to be accomplished. No argument is needed to show that a requirement that the stock of a corporation shall be paid in money, or in labor or property at its money value, inures to the benefit of persons who may become creditors of the corporation, in that it requires the capital stock to be the representative of substantial values and insures the existence of a fund which must be within reach for the satisfaction of debts if the affairs of the corporation are managed as contemplated by the law. It is equally clear that if a stock subscription which is required to be made payable in money, or in labor or property at its money value, and is in fact made payable in property at a designated money valuation, may be satisfied by the transfer of property the value of which is insignificant or merely nominal as compared with the valuation stated, then, so far as this provision of the law looks to the protection of creditors, it might as well have allowed the subscription to be made payable in "chips and whetstones." Except § 6 of Art. XIV of the Constitution and section 1805 of the Code of 1876, there were not, at the time of the formation of the appellee, in reference to the mode of satisfying stock subscriptions, adequate provisions for the protection of creditors of such corporations. Those enactments are appropriate for this purpose. The requirement of section 1805 of the Code of 1876 that "in case of a failure to perform the labor, or deliver the property according to the terms of the subscription, the money value thereof as named in the lists of subscription,

shall be paid by the subscribers," can not be regarded as providing for a penalty to compel the performance of the labor or the delivery of the property. The evident meaning is, that in the event of such failure, the corporation shall receive the equivalent, and no more nor less than the equivalent, in money of the labor or the property as the case may be. This clause of the statute is convincing that the statement of the money value of the property in which the subscription is made payable is a material feature of the contract, and that the property delivered must be of a value to correspond with that named in the subscription. As affecting the rights of creditors, the statute is simply a definite requirement as to what shall constitute that trust fund to which persons dealing with the corporation have a right to look. The defendants in this case in making and accepting payments on the stock subscriptions were acting in a fiduciary capacity in reference to that fund. The performance of the contract of subscription to be binding on creditors should have been such as is required in the case of a contract between a trustee and one having knowledge of his trust obligation. In form the stock subscription was such as the statute called for. Under section 2023 of the Code of 1876 and § 8 of Art. XIV of the Constitution, the stockholders are liable only for the unpaid stock owned by them. But the creditors are entitled to demand that the payment on the stock shall be an actual and *bona fide* discharge of the liability imposed by the contract of subscription. The defendants, in making and accepting payment in property, were bound to exercise their judgment and discretion fairly and honestly directed to secure a substantial compliance with the terms of the contract. In the exercise of that judgment and discretion they are entitled to the benefit of whatever margin there may be for honest differences of opinion in the valuation of the property. But a deliberate and intentional over-valuation of the property is not permissible. The transfer of property known to be worth only $5,000 to pay a stock subscription of $200,000 does not bear the semblance of a compliance with the contract of subscription as to one of the essential terms thereof. The taking of property at a valuation forty times greater than its actual worth, which was known to the parties, shows upon its face the absence of a *bona fide* exercise of judgment and discretion in making the valuation and an intentional non-compliance with the requirement that the property shall be taken at its money value. The absence of fraudulent motive on the part of a trustee does not give validity to a mere simulated execution of the trust; and an averment of fraud in reference thereto is unnecessary. The parties beneficially interested in the trust

are entitled to a substantial compliance with its terms. They are not bound by an act of mere formal compliance which really involves their practical exclusion from the benefits intended to be secured to them. The capital stock of a corporation constitutes the basis of its credit and persons dealing with the corporation have a right to assume that the stock has been actually paid in or that it may be reached. The transaction whereby payment was attempted to be made, as shown by the averments of the bill in this case, is not binding on creditors because it did not constitute such a payment as was contemplated by the terms of the contract of subscription, and was in effect a palpable evasion of the requirements of the statute. It is, however, contended in the argument for appellees that the appellant through its officers knew of the history of the organization of the appellee corporation and of the mode in which the subscriptions to the stock were to be paid; that in fact it was an active promoter of the whole transaction in advance. It may be that such an unauthorized extinguishment of the subscription liability may not be impeached by one who was actively instrumental in securing the organization of a corporation with a view of making a sale of property to it and did in fact accept benefits in dealing with the corporation with full knowledge of the arrangement by which the stock was proposed to be paid for. Disability to question a wrongful transaction usually attaches to a party who consented thereto or participated therein.—*First National Bank v. Gustin M. C. Mining Co.*, 6 L. R. An. 676; *Bank of Fort Madison v. Alden*, 129 U. S. 372; *Parsons v. Joseph, supra;* 2 Morawetz on Private Corporations, § 829. But the averments of the bill in this case do not show that the appellant participated in or knew of the mode in which the stock subscription was undertaken to be paid. In the absence of averments upon this subject, it is not to be taken for granted that the appellant, in making the agreement to convey the land to the corporation when formed contemplated that the stock in the corporation should not be paid for as the law directed; or, that in accepting the notes of the corporation it had such knowledge and such part in the furtherance of the acts connected with the transfer of the bond for title for the stock, that it is to be presumed to have dealt with the corporation on the basis of treating its capital stock as fully paid up. We find nothing in the averments of the bill to preclude appellant from asserting the right of a creditor of a corporation to hold stockholders liable for subscriptions to stock not really paid for. The statements of fact in the bill support the conclusion therein averred, that the transaction by which payment for the stock

was attempted to be made was merely colorable; in other words, that it was not really a payment, but had only the outward appearance without the substance of payment. Such being the case, the individual defendants are still liable on their stock subscriptions, to the extent that the attempted payment falls short of a *bona fide* compliance with the terms of the contract; and the allegations as to excessive over-valuation of the property in question were sufficient under the rules above stated. The Chancery Court erred in sustaining the demurrers.

Reversed and remanded.