CHARLES KELLY, RESPONDENT, *v.* JOS. K. CLARK,
(IMPLEADED WITH OTHERS) APPELLANT.

[Submitted Jan. 23, 1898.   Decided July 5, 1898.]

*Corporations — Insolvency — Remedy of Creditors — Stockholders' Liability—Torts—Pleading—Surplusage—Limitations—Accrual of Cause.*

1. Where a complaint by a creditor of a corporation to enforce a stockholder's statutory liability unnecessarily alleges actual fraud on the part of defendant, the allegation will be treated as surplusage, and plaintiff may recover on proof of proper allegations of fraud in law, no motion to correct the pleading being made. ·

2. Since Comp. St. 1887, Div. 5. C. 25, Sec. 457, providing that stockholders shall be individually liable to creditors to the amount of their unpaid stock for all acts of the company until the whole amount of stock subscribed for shall have been paid in, prescribes no remedy, a judgment creditor whose execution against the corporation has been returned *nulla bona* may go into equity to obtain relief against the stockholders.

3. Under Const. Art. 15, Sec. 10, providing that no corporation shall issue stock except for labor done or money and property actually paid, and all fictitious increase of stock shall be void; and under Comp. St. 1887, Div. 5, C. 25, Sec. 457, providing that stockholders shall be individually liable to creditors to the amount of their unpaid stock for all acts of the company until the whole amount of stock subscribed for shall have been paid in; and Section 458, providing that the trustees of a company may purchase mines and issue stock to the amount of the value thereof, in payment thereof, which shall be taken as full paid stock, and not liable to any further call,—the purchase of a mine which the stockholders knew was worth not over $125,000, and payment therefor in stock whose par value is $7,500,000, which is repurchased by the stockholders with full knowledge of the transaction at 2½ per cent. of its par value, is fraudulent as to a creditor, and the stock will be treated as unpaid to the extent of the difference between the actual value of the mine and the nominal value of the stock.

4. One accepting mining stock issued to him with knowledge that it was issued for a mine worth only about 1⅔ per cent. of the total stock subscribed cannot escape liability to creditors for the unpaid balance on the ground that he did not sign the stock subscription list.

5. Under Comp. St. 1887, Div. 5, C. 25, Se . 457, providing that stockholders shall be individually liable to the amount of their unpaid stock for all acts and contracts of the company until the whole amount of stock subscribed for shall have been paid in, a holder of such unpaid stock is liable for the torts of the corporation.

6. The statute of limitations (Comp. St. 1887, Div. 1, Sec. 42), does not begin to run against a stockholder of a corporation liable on unpaid stock for a tort of the corporation, until the creditor has liquidated his claim, or reduced it to judgment, and failed to make it against the corporation, unless it appears to be useless to proceed against the corporation.

*Appeal from District Court, Lewis and Clarke County; Horace R. Buck, Judge.*

Suit by Charles Kelly against the Fourth of July Mining Company, Joseph K. Clark, and others.   There was a judg-

ment for plaintiff against Joseph K. Clark, and from the judgment and an order denying a new trial he appeals. Affirmed.

Statement of the facts by the justice delivering the opinion.

The Fourth of July Mining Company, a mining corporation. was organized under the laws of Montana (Chapter XXV, Fifth Division, General Laws of 1887) on December 19, 1889. Its capital stock named in the articles of incorporation was $7,500,000, consisting of 750,000 shares of $10 each. The articles of incorporation were signed by J. K. Pardee, S. T. Hauser, E. Zimmerman, W. F. Sanders, T. H. Kleinschmidt, J. K. Clark, and L. Teuscher. These same persons were named in the articles as trustees, and became the trustees of the corporation, which was immediately perfected in its organization by the election of the defendant J. K. Clark as president, S. T. Hauser as vice-president, T. H. Kleinschmidt as treasurer, C. B. Garrett as secretary, and J. K. Pardee as manager.

The complaint of the plaintiff (respondent here), after averring the facts as hereinbefore set forth in relation to the incorporation and organization of the corporation, then alleges that the trustees of said company, for the purpose of fraudulently relieving all persons who had theretofore subscribed for stock, or who might thereafter subscribe for stock or who might thereafter by any means become owners of stock in the said company, from any personal liability by reason of such subscription or ownership, did on Dec. 19, 1889 cau e to be spread upon the records of the meeting of the trustees a resolution to the effect that. J. K. Pardee appeared before the meeting, and offered to convey a seven-eighths interest of the Fourth of July Mine to the corporation, in consideration of 750,000 shares of the stock of said corporation. and that the proposition was accepted. It is averred that, upon the acceptance of said proposition, the said Pardee transferred to the corporation a seven-eighths interest in said mine, and the

trustees thereupon directed that the company deliver to T. H. Kleinschmidt, trustee for J. K. Pardee, by agreement with the said trustees, all of the capital stock of said company, to-wit, 750,000 shares, to be by said Kleinschmidt distributed as the said Pardee should direct; that the seven-eighths interest in the mine conveyed by Pardee to the corporation was not of greater value that $75,000, and that each and all of the trustees knew at the time of conveyance of the same that it was of no greater value than $75,000, but that, in violation of their duty, the trustees fraudulently, and with intent to relieve such persons as had subscribed for stock of said company, or who might thereafter subscribe, or who might become owners of stock, from any personal liability by reason of such subscription or ownership, accepted the conveyance from Pardee in full payment for 750,000 shares of stock issued as aforesaid; that the corporation was organized to purchase the said seven-eighths interest from Pardee, and that for such purpose the defendants Kleinschmidt, Seligman, Clark, Phelps, and the other parties named as trustees, together with others, associated themselves to organize the said mining company, and to acquire the said property under the mutual agreement that the corporation should be organized with a capital stock $7,500,000 in shares of $10 each, and that all of the stock should be, as it afterwards was, transferred to said Pardee in exchange for the seven-eighths interest in the mine, each of the persons associating themselves agreeing to take from Pardee, after the stock should be issued to him, a certain number of shares of the stock at the rate of 25 cents per share; and that each and all of such persons, at the time they associated themselves together, well knew that the said seven-eighths interest in the said mine was not worth to exceed $75,000, and that $7,500,000 was a sum grossly and fraudulently in excess of the true value of the mine, and that the said agreement to so issue the stock to the said Pardee was entered into between the said persons so associating themselves with the fraudulent intent of relieving themselves from any personal liability by reason of their becoming the owners of

any of said stock upon the pretense that the same had been fully paid for; that each of the defendants became the owner of certain shares of the capital stock of the company, defendant Clark being at the time of the commencement of this action the owner of 173,800 shares, and that each of the defendants acquired his stock with the full knowledge of the fact that the same had been originally issued to Pardee upon a gross and fraudulent overvaluation of the property transferred in exchange for the same, and that the said property so transferred was of a value not to exceed $75,000, by reason of which plaintiff averred that all of said stock so held by the defendants is unpaid stock, except in the proportion which $75,000 bears to $7,500,000.

The plaintiff then avers that on June 28, 1894, he recovered a judgment against the Fourth of July Mining Company in the sum of $15,600 and costs, for damages on account of personal injuries plaintiff received while in the service of the defendant company and under contract with it; that execution was duly issued upon said judgment, but that the same was returned wholly unsatisfied; and that the Fourth of July Mining Company is wholly insolvent. The plaintiff demanded judgment that the amount due and unpaid upon the stock of said mining company held or owned by defendants may be determined by the court, and that they and each of them be adjudged to be indebted thereon to the said mining company upon each share of stock held or owned in the amount of the face value thereof, to-wit, $10, less such proportion of the sum of $10 as $75,000 bears to $7,500,000; that they and each of them be required to pay into court such sums as may be so found due; and, that out of the sum so paid, plaintiff be paid the amount of his judgment against the corporation, with interest and costs.

The defendant Clark denied the allegations of the complaint in relation to the fraudulent intent and purposes alleged in plaintiff's complaint pertaining to the organization and purposes of the organization of the corporation, and set forth affirmatively "that at the first meeting of the board of di-

rectors of the company a proposition, similar to the one referred to in the complaint, was made to the directors; that said proposition was referred to a committee of three members of the said board of directors, to investigate said proposition and report thereon to said board of trustees; that the committee reported that the property offered for sale was worth the consideration asked therefor, and that it was for the best interest of said corporation to accept such proposition and purchase said property; and that thereafter defendant Clark, relying on the report of said committee, and in good faith believing the same, and with no intention at that time of buying any stock in said company, and without having agreed to buy any thereof, voted to accept such proposition. Clark further states that he never bought or agreed to buy any stock in said corporation until long after the stock had been issued in payment of the same, and that he never did buy any stock except such as was purchased by him in open market, and that all such stock was on its face declared to be fully paid. Defendant's answer also sets forth the fact that on the 19th day of December, 1889, the Fourth of July property so bought by the company was of the reasonable value of $7,500,000."

The defendant Clark, for a separate defense, also alleged that the injury which the plaintiff herein suffered, and for which he recovered the judgment mentioned in the complaint herein, was received by him more than three years before the commencement of this action, and that all the stock which he ever bought or owned in said defendant company was so bought more than four years prior to the commencement of this action.

The defendants Seligman and the Fourth of July Mining Company filed a separate answer, setting forth substantially what the answer of defendant Clark contained in relation to the denials of fraud alleged in plaintiff's complaint.

The plaintiff replied to defendant Clark's answer, denying Clark's belief in the report of the committee in relation to the value of the mine, or that he acted thereon in good faith, denying that defendant Clark never agreed to buy stock in the

corporation until long after the stock had been issued in pay-
ment for the mine, and denying that all or any of the rest of
the stock ever bought or owned by defendant was bought by
him from a prior purchaser, who had bought the same in open
market. The replication to the other answer is substantially
the same as the last.

The case was tried to a jury. Separate findings were re-
turned. The court adopted all the findings of the jury ex-
cept two. Conclusions of law were made by the court, ren-
dering J. K. Clark liable for the claim of plaintiff. Judgment
was ordered accordingly in plaintiff's favor, against Clark, but
in favor of defendants Kleinschmidt and Seligman. Defend-
ant Clark moved for a new trial, which was denied. He ap-
peals to this court from the judgment and the order denying
his motion for a new trial.

*Clayberg & Corbett, John B. Welcome, Wm. II. De Witt*
and *Thos. C. Bach,* for Appellant.

It is contended on the part of appellant that the court be-
low erred in ordering judgment for the plaintiff in this that
neither the complaint nor the evidence herein support the said
judgment. It is difficult to determine from an examination
of the complaint or from the evidence submitted whether it
is sought to charge the defendant solely as a subscriber of
stock for the difference between what he actually paid there-
for and the par value thereof, or whether it is sought to
charge him with fraud as a director of the company. From
the complaint it would appear that the plaintiff seeks to re-
cover on the theory that the trustees fraudulently and with in-
tent to deceive, and for the purpose of relieving themselves of
personal liability on any stock they might buy in the said
company, and with the intention of becoming stockholders
caused all the capital stock to be issued to J. K. Pardee, in
payment of property which they claim was of the value of
only $75,000. It will be seen then that actual fraud is
charged, but it is not alleged that plaintiff was misled by any

action of the trustees nor is it alleged or shown by the evidence how Kelly was placed in any different position, with reference to the injury sustained by him and by reason of the issuance of the stock in payment of the property in excess of its actual value, than he would otherwise have been, no damage was shown to have resulted to Kelly. It can hardly be said that when Kelly entered the employ of the Fourth of July Company he anticipated being injured and was willing to suffer the injury relying upon the fact that the capital stock of the company for which he worked was in the hands of persons who had not paid full par value therefor. If the testimony on behalf of plaintiff shows any fraud it is constructive and not actual. To entitle plaintiff to recover here he must prove actual fraud. (Biglow on Frauds, Vol. 1, page 42; Thompson on Corporations, Vol. 2, S. 1629.) Allegation of fraud is not proved by proof of mistake. (39 Cal. 532; Thompson on Corporations, Vol. 2, S. 1619.) If it is sought to charge Clark for balance unpaid on a subscription to stock of the corporation, we contend that the judgment is not supported by the pleadings or the evidence, and that the court below erred in rendering judgment thereon. It is admitted by the plaintiff's complaint that the seven-eighths interest in the Fourth of July Mine at the time it was purchased by the Fourth of July Company was of the value of $75,000. The court found its value to be $125,000. The value of the shares at the time of their issuance to Pardee, was nil. The company was organized for the purpose of carrying on mining operations; the property purchased was mining property; the shares issued therefor were what is known in this country as mining shares, and bore on their face the statement that they were fully paid and non-assessable. The property for which these shares were issued had an actual substantial value, and we contend that under no theory can it be held that any purchaser of these shares, even with a knowledge of the conditions under which they were issued, could be held as a subscriber of stock for the difference between the amount paid therefor and the par value thereof.

At common law it is well settled that corporate creditors cannot hold stockholders liable on stock which has been issued for property, even though the property was turned over to the corporation at the agreed valuation which was largely in excess of the real value of the property, provided the property has some substantial value. ( *Van Cott* v. *Van Brunt,* 82 N. Y. 535; *Fogg* v. *Blair,* 139 U. S. 118; *Barr* v. *New York, Etc., Railroad,* 125 N. Y. 262; *Bickley* v. *Schlag,* 20 Atl. Rep. 250; *Clow* v. *Brown,* 31 N. E. Rep. 361; *Dupent* v. *Tilden,* 42 Fed. Rep. 87; *Coffin* v. *Randall,* 1 Corp. & L. J. 326; *Continental Telegraph Co.* v. *Nelson,* 18 Weekly Digest 48; *Morrison* v. *Globe Panorama Co.,* 28 Fed. Rep. 817: *Crawford* v. *Rohrer,* 59 M. D. 599; *Phelan* v. *Hayard,* 5 Dill. 45; *Scofield* v. *Thayer,* 105 U. S. 143; *Anderson's Case L. R.,* 7 Ch. D. 75; Cook on Stock and Stockholders, 3rd Ed., Vol. 1, S. 26.) We contend that the common law with reference to the liability of stockholders still obtains in Montana. The Montana Constitution provides that no corporation shall issue stock or bonds except for labor done, or money or property actually received; and all fictitious stock or indebtedness shall be void. This constitutional provision is the same as is embraced in the constitution of various other states where it has been held that the provision is applicable and effective, only when the issue of stock is entirely fictitious, and that it does not interfere with the customary methods of starting a corporation enterprise by the issue of stock and bonds in payment of corporate property. (Cook on Stock and Stockholders, 3rd ed., Vol 1, S. 47; *Peoria Railroad Co.* v. *Thompson,* 103 Ill., 107; *Stein* v. *Howard,* 65 Cal. 616; *Memphis Railroad* v. *Dow,* 120 U. S. 287; *Fogg* v. *Blair,* 137 U. S. 118.) Nor do the Montana Statutes change the rule with reference to the liability of stockholders. Section 457 of the Fifth Division of the General Laws Compiled Statutes of Montana provides that "The parties or stockholders of every company incorporated under the provisions of this article shall be severally and individually liable to the creditors of the company under which they are stockholders

to the amount of the unpaid stock held by them respectively, for all acts or contracts made by such company, until the whole amount of capital stock subscribed for shall have been paid in.'' The succeeding section, Section 458, provides that ''The trustees of such company may purchase manufactories and other properties necessary for their business and issue stock to the amount of the value thereof in payment therefor, and stock so issued shall be declared and taken to be full stock and not liable to any further call; neither shall the holders thereof be liable for any further payment, under the provisions of Section 456 of this chapter, but in all statements the reports of the company to be published this stock shall not be stated or reported as being issued for cash paid into the company, but shall be reported in this effect according to the facts.'' This statute we contend is simply affirmatory of the common law doctrine hereinbefore stated, and it surely cannot be held that Section 458, even by implication in any manner enlarges the rights of the creditors of a corporation as against the stockholders.

*C. B. Nolan & T. J. Walsh*, for Respondent.

The sufficiency of the evidence to sustain the specific facts alleged is not attacked in appellant's brief. The claim is made, however, that in point of law the complaint is insufficient, not because of any formal omissions or technical lack, but because the law does not afford any relief under the circumstances, all mere questions of pleading being waived. The sole question for consideration as presented by the brief is, therefore, whether the complaint supports the judgment. The brief asserts that it is ''well settled'' that stockholders are not liable to creditors on stock issued for property at a valuation largely in excess of its true value, assuming that the trustees knew of the overvaluation. The question was mooted at one time, but no court has undertaken to so decide within ten years. (*Coffin* v. *Ramsdell*, 11 N. E. 20; *Adamant Co. v. Wallace*, 48 Pac. 415–416; *Boynton* v. *Hatch*, 47 N. Y. 225; *Boynton* v. *Andrews*, 63 N. Y. 93; *Douglass* v. *Ireland*, 73

N. Y. 100; *Iron Co.* v. *Drexel*, 90 N. Y. 87; (1890) *Gamble* v. *Water Co.*, 123 N. Y. 91; (1891) *National T. W. Co.* v. *Gilfillan*, 124 N. Y. 302; (1891) *Goodrich* v. *Dorman*, 14 N. Y. S. 879; (1892) *Herbert* v. *Uhl*, 20 N. Y. S. 743; (1895) *White* v. *Jones*, 34 N. Y. S. 203; (1891) *Elyton Land Co.* v. *Birmingham*, 92 Ala. 407; *Coit* v. *N. C. Gold Amalgamating Co.*, 119 U. S. 343; (1892) *Lloyd* v. *Preston*, 146 U. S. 630; (1890) *Libby* v. *Tobey*, 19 At. 904; *Wetherbee* v. *Baker*, 35 N. J. E. 501; *Shickle* v. *Watts*, 94 Mo. 410; (1890) *Farmers' Bank* v. *Gallagher*, 43 Mo. App. 482; (1891) *Lucke* v. *Tredway*, 45 Mo. App. 507; *Alling* v. *Wenzel*, 27 Ill. App. 511; (1890) Same Case, 133 Ill. 264; (1895) *Coleman* v. *Howe*, 154 Ill. 458; (1891) *Thayer* v. *El Pomo M. Co.*, 40 Ill. App. 344; *Bailey* v. *Coal Co.*, 69 Pa. St. 334; (1895) *Pen. Sav. Bank* v. *Stove Polish Co.*, 63 N. W. 514; *Osgood* v. *King*, 42 Ia. 478; *Chisholm* v. *Forney*, 21 N. W. 664; *Jackson* v. *Traer*, 20 N. W. 764; *Boulton* v. *Mills*, 78 Ia. 460; (1894) *Henderson* v. *Turngren*, 35 Pac. 495; (1891) *Gogebic Inv. Co.* v. *Iron Chief M. Co.*, 47 N. W. 726; (1892) *Hospes* v. *N. W. Car Co.*, 50 N. W. 1117; (1896) *Hastings* v. *Iron Range Co.*, 67 N. W. 652; (1896) *Wishard* v. *Hansen*, 68 N. W. 691; (1895) *Gilkie* v. *Dawson*, 64 N. W. 978; (1896) *Salt Lake* v. *Tintic M. Co.*, 45 Pac. 200; (1897) *Adamant Co.* v. *Wallace*, 48 Pac. 415; (1897) *Roman* v. *Dimmick*, 22 So. 109; (1897) *Addison* v. *Milling Co.*, 79 Fed. 459.)

Under Compiled Statutes, 5th Div. Sec. 458, it is immaterial whether the overvaluation is intentional or fraudulent or not, the property pays for the stock only to the extent of its actual value. (Thompson's Commentaries, 1616.) In the foregoing list of cases, those from New York are placed first because section 458 of our statute is a verbatim copy of the section of their general manufacturing act, permitting corporations organized under it to pay for property with stock. (See *Boynton* v. *Hatch*, 47 N. Y. 230.) The case of *Van Cott* v. *Van Brunt*, 82 N. Y. 535, arose under a statute which placed no restriction whatever on the power of the corporation to dispose of its stock for anything and at any price.

And the decision was, in the opinion, distinguished from *Boynton* v. *Hatch* upon this very ground.   And lest any misconception might arise about the matter, the court of appeals took occasion to point out in *Gamble* v. *Water Co.*, 123 N. Y. 107, that this fact explains the apparent conflict between *Van Cott* v. *Van Brunt* and the line of cases of which *Boynton* v. *Hatch* was the parent.   The appellant says that the liability under this statute is the same as the liability at common law. The New York Court of Appeals says in these cases that it is not, and as our statute comes from that state we are under the necessity of taking their exposition.   It may be said in this connection, however, that the common law, as now construed, as shown by many of the cases cited, when no special statute exists, condemns the subterfuge of fraudulently over-valuing property taken in exchange for stock, and holds it as paid in such cases only to the amount of the true value of the property.   The charter under consideration in *Coit* v. *N. C. A. Co.*, 119 U. S. 343, empowered the trustees to take either money or property in payment for stock, but it contained no provision to the effect that the property should be taken at its value.   The case next cited by the appellant, *Fogg* v. *Blair*, 139 U. S. 118, is likewise much availed of to support the general proposition of non-liability in this class of cases.   But what did it decide?   Simply that when a corporation was a "going concern" and was indebted and had no other means of discharging its obligations to its creditors, it might, in satisfaction of its existing obligations, turn out whatever stock remained unappropriated at such value below par as it might agree upon with the creditor, who would otherwise throw the corporation into bankruptcy, and that no liability would attach to the creditor taking the stock under those circumstances. It is only those who wilfully see awry who find in this case any justification for the contention that at its organization a corporation can put out its stock as full paid when it is not full paid and have it circulate in the hands of those who take it with knowledge, freed from liability.   This was a feature also in the case of *Van Cott* v. *Van Brunt*.   The cases of

*Hundley* v. *Stutz*, 139 U. S. 417, and *Clark* v. *Bever*, 139 U. S. 96, held the same way. That the learned and august tribunal pronouncing these judgments did not intend by the decision in them to recede from the doctrine it had established in a long line of cases, *Sanger* v. *Upton*, 91 U. S. 56; *Upton* v. *Trebilcock*, 91 U. S. 45; *Webster* v. *Upton*, 91 U. S. 65; *Chubb* v. *Upton*, 95 U. S. 665; *Pullman* v. *Upton*, 96 U. S. 328; *Hatch* v. *Dana*, 101 U. S. 205; *Hawley* v. *Upton*, 102 U. S. 314; *Scoville* v. *Thayer*, 105 U. S. 143; *Patterson* v. *Lynde*, 106 U. S. 519; *Coit* v. *N. C. G. A. Co.*, 119 U. S. 343; *Washburn* v. *Green*, 133 U. S. 30, that no sort of arrangement with the corporation, short of actual payment for the stock, would relieve those who became its holders, except under the peculiar circumstances involved in the cases reported in the 139 U. S. and above referred to, it itself declared in *Camden* v. *Stuart*, 144 U. S. 104. And when the case of *Lloyd* v. *Preston*, 146 U. S. 630, came before it, a case presenting identically the same legal features as the one now before this court, it merely said: "It having been found on convincing evidence that the over valuation of the property transferred to the railway company by Harper, in pretended payment of the subscription to the capital stock, was so gross and obvious as, in connection with the other facts in the case, to clearly establish a case of fraud, and to entitle *bona fide* creditors to enforce payment by the subscribers, it only remains to consider the effect of the other defenses set up." It is not necessary to classify this action. There are two theories of the liability in these cases—one the fraudulent representation theory, the other the trust fund theory. This complaint is good whichever theory is adopted. If the former, it is good by the rule of *Hospes* v. *N. W. Car Co.*, 50 N. W. 1117; if the latter, it is good by the rule of *Gogebic Inv. Co.* v. *Iron Chief Co.*, 47 N. W. 726. It is said that if the case proceeds upon the fraud theory, it must be averred that the plaintiff relied upon the fraudulent representation. The contention was made and refuted by the court in the Hospes case, above cited, which vigorously maintains the fraud theory.

Supplemental brief of appellant:   It is admitted in the case
that the defendants, and particularly the defendant Clark, had
no intention, at the time that he accepted the property at an
overvaluation, of relieving himself from any responsibility or
liability whatever, either as a stockholder or as a trustee.
The trial court has accepted the theory that the mere fact of
overvaluation constitutes legal fraud, and has ignored the
question as to whether or not the defendants intended to ben-
efit themselves by their so-called fraud.   This question was
considered in the case at the time of trial.   The court sub-
mitted to the jury a certain finding, numbered 6 (see tran-
script on appeal, p. 147), which finding is as follows: "When
the defendant Clark took part in the action of the trustees of
the company at the meeting held on December 19, 1889, in
passing resolutions and proceedings there had, did he do so
with the intention or purpose of relieving himself or other
stock purchasers from a personal liability on the stock that he
or they might acquire?"   The jury found in the negative on
this question, and found, therefore, that Clark had no such
intent.   But afterwards, the court appears to have taken the
view that the mere overvaluation of the property in the way
that it is shown to have been overvalued, if it was so shown,
in itself constituted fraud, without any question arising as to
the intention of the defendants in overvaluing the property,
if they did overvalue it.   We contend that this theory of the
case adopted by the court is not the proper one.   To entitle
the plaintiff to recover in the case he must prove actual fraud,
(Thompson on Corporations, Sec. 1618.), *Whitehall* v. *Jacobs*,
75 Wis. 474; in which case the Supreme Court of Wisconsin
holds that the true rule is as stated by the Supreme Court of
the United States in *Coit* v. *The Amalgamating Co.*, 119 U.
S , 343, wherein the Supreme Court of the United States
stated the rule to be as follows:   That if it were
proved that actual fraud was committed in the pay-
ment of the stock * * * there would undoubtedly be
substantial ground for the relief asked.   (*Ft. Madison Bank*
v. *Alden*, 129 U. S., 373; *Young* v. *Erie Iron Co.*, 65 Mich.

111.)   That the question of fraud should be tried and left to the jury or to the court, and that it should be tried and found as a question of fact in the case.   (See Thompson on Corporation, Sec. 1629.)

The basis of this action is the fraud which the trustees of the Fourth of July Co. or the defendants in this action perpetrated at the time of the organization of the company and the purchase of the property.   Unless the main question of fraud of the defendants be found and determined, the case cannot be considered as having been decided.   The jury, it is true, decided this question of fraud, and decided it in favor of the defendants, but the court set aside the findings of the jury upon the question of fraud and failed to make any finding at all upon that question.   We therefore respectfully submit that, the question of fraud not having been found against the defendants, the judgment of the court is not supported by the findings, and that the court should have found directly upon this question of fraud.   The authorities hereinbefore cited upon the question that actual fraud must be proved, are clearly applicable to this point as deciding that the question of fraud must be determined, and the opinion of the Supreme Court of the State of Wisconsin in the case of *Whitehall* v. *Jacobs*, above cited, is peculiarly applicable.   The appellants further contend that in a case such as the one at bar the plaintiff has no right of recovery under the facts pleaded and proved.   (Cook on Stock and Stockholders and Corporation Law, Third Edition, Vol. 1, Sec. 46.)

In the action at bar, the plaintiff Kelly, having instituted and tried his action against the defendants upon the theory that the defendants were guilty of fraud, and having recovered his judgment in this action upon the facts found by the court and the jury that the defendants, and particularly the defendant Clark, were so guilty, as charged in the plaintiff's complaint, then it must be true that the plaintiff's rights must be determined according to the rules laid down and adopted by text writers and courts of last resort governing actions of a similar nature.   Where fraud is relied upon as the basis of

the action, the plaintiff is required to show (and in some juris-
dictions is even required to plead) that he, the party com-
plaining of the fraud, relied thereon, and that his action
would have been other or different save and except for the
fraudulent misrepresentations or other fraudulent propositions
complained of. (Pomeroy's Equity Jurisprudence, Second
Edition, Vol. 2, Sec. 890.) Assuming, for the sake of argu-
ment, that the proceedings complained of in plaintiff's com-
plaint in and about the institution of the Fourth of July com-
pany and the issuance of its stock, were as fraudulent as
plaintiff asserts, it cannot be conceived that the plaintiff, at
the time he received the injuries which he mentions in his
complaint as the basis of his action, was relying upon any
representation as to the paid up quality of the shares of the
defendant corporation. It is not reasonable to suppose that
the plaintiff, when he entered into the employ of the defend-
ant company, expected that he would receive a personal in-
jury from the negligence of the company, and further ex-
pected to be compensated for his injury, and that he relied
for such compensation upon the fact that the trustees of the
Fourth of July company had held out to the public that the
shares of stock of the corporation were full paid up to the ex-
tent of $7,500,000, or any other sum. (Citing: *First Na-
tional Bank of Deadwood* v. *Gustin Minerva Con. Min. Co.*,
44 N. W. Rep. 198; *Hospes* v. *Northwestern M'f'g and Car
Co.*, 50 N. W. Rep. 1117 (and cases cited); *Adamant Manu-
facturning Co.* v. *Wallace*, 48 Pac. 145; Cook on Stock and
Stockholders, Vol. 1, Section 46; *Bank of Fort Madison* v.
*Alden*, 129 U. S. 373; *Coit* v. *Gold Amalgamating Co.*, 119
U. S. 343).

Reply brief of respondent: In our view the natural and
necessary consequence of the acts of the trustees (could they
be sustained) would be to relieve the stock from liability; and
the law, deeming that they intended the natural and necessary
consequences of their acts, will say that the transaction is
fraudulent. So the New York court holds. Lest it should

be imagined that perhaps the New York court is peculiar in its views upon this point, we quote the following from the opinion of the Supreme Court of Nebraska in *Gilkie* v. *Dawson*, 64 N. W. 978-983: "It will be sufficient to impeach the transaction to prove that the stock issued and delivered to the subscriber exceeded in amount the value of the property conveyed to the corporation in payment for the stock; that the parties to the transaction of sale and purchase of the stock knowingly and advisedly placed such overvaluation upon it; that there was paid in stock for it an amount the par value of which was known to be more than the actual value of the property. (*Tube Works* v. *Gilfillan*, 124 N. Y. 302, 26 N. E. 538; *Wetherbee* v. *Baker*, 35 N. J. Eq. 501; *Osgood* v. *King*, 42 Iowa 478; *Carbon* v. *Mills*, 78 Iowa 460, 43 N. W. 290; *Jackson* v. *Traer*, 64 Iowa 469, 20 N. W. 764; *Bailey* v. *Coke Co.*, 69 Pa. St. 334; *Thayer* v. *El Pomo Mining Co.*, 40 Ill. App. 345; *Elyton Land Co.* v. *Birmingham Warehouse and Elevator Co.*, 92 Ala. 407, 9 South. 129; *Leucke* v. *Tredway*, 45 Mo. App. 507; *Crawford* v. *Rohrer*, 59 Md. 599; *Northwestern Mut. Life Insurance Co.* v. *Cotton Exchange Real Estate Co.*, 46 Fed. 22; *Scoville* v. *Thayer*, 105 U. S. 143)." Now what is the extent of that liability and to what class of obligations does it extend? Sec. 457 Compiled Statutes, 5th Div. answers this. How is it possible to cut out of this statute the words "acts of" and say the liability extends to contract obligations only? That this liability reaches to torts goes without saying. (Spelling on Corporations, 909; *Powell* v. *Railway Co.*, 36 Fed. 726.)

Brief of Wm. H. DeWitt in answer to brief of respondent: Respondent claims that it is not important to classify this action. While we concede the general principle that under modern procedure one may set up the facts, and receive from the court the relief which the facts show he is entitled to, still he must depend upon legal principles for an adjudication upon the facts; it is, therefore, important to determine upon what legal principle respondent brought this action. He seems, in

a portion of his briefs, to rely upon the statutes. (Sections 457, 458, Compiled Statutes of 1887.) If the respondent relies upon these sections of the statute, then his action is "upon a liability created by statute." (1 Wood on Limitations, p. 90, Sec. 36, p. 59, note 77; *Higby* v. *Calaveras County*, 18 Cal. 176.) If the action is upon a liability created by statute it is important to note that respondent was injured May 26, 1891. The cause of action, if any, under section 457, arose then, for the statute undertakes to make the stockholders liable for all acts or contracts made by the corporation. The act for which respondent seeks to make the stockholders liable was the act of injuring him by the company in 1891. Therefore, the stockholders then became liable and the cause of action then arose, and the action could then have been commenced against the stockholders (*Young* v. *Rosenbaum*, 39 Cal. 646), but the action was not commenced against the stockholders until August 13, 1894. The statute, which was two years, had then run. (Compiled Statutes of 1887, 1st Div., Sec. 42, and Laws of 1893, page 50.) Furthermore, if the action is one for liability created by statutes, then the original judgment of Kelly against the Fourth of July Mining Company, recovered June 28, 1894, was not evidence of the debt of the corporation to Kelly, but this judgment was the only evidence offered, and, therefore, there was none upon these points. (*Stephens* v. *Fox*, 83 N. Y. page 317, citing *Miller* v. *White*, 50 N. Y. 137, and *McMahon* v. *Macy*, 51 N. Y. 155. See, also, other cases in former briefs, and, as an analogous case, *Rodini* v. *Lytle*, 17 Mont. 448; also, *State Savings Bank of Butte* v. *Johnson*, 18 Mont. 440.) The question of the bar of the statute is raised in Clark's answer, page 11, line 17, and the time of the commencement of the injury also appears in the record. The constitution of the state is not important in this action. It provides that "No corporation shall issue stocks or bonds, except for labor done, services performed, or money and property actually received, and all fictitious increase of stock or indebtedness shall be void." In this case it is admitted that stock was issued for

property actually received. There can be no contention that this stock was fictitious; it may have been overvalued, but it had a substantial value (see cases in former brief), and was, therefore, not fictitious.

This action, if anything, is a creditor's bill. The respondent himself so states in his brief No. 1, first paragraph. (See, also, Morawetz on Corporations, Sec. 866; *Hastings* v. *Daniel Drew*, 76 N. Y. page 9, and the cases in each printed brief. When Kelly obtained his judgment against the Fourth of July Company he then became subrogated to the rights of the company as against subscribing stockholders for an unpaid balance on the stock. (*Stephens* v. *Fox*, 83 N. Y. 313, and cases in former brief.) If there were a fraud between the corporation and the subscribing stockholders, neither could raise that question because each was a participant in the fraud, and neither could take advantage of their own fraud. But Kelly being subrogated to the rights of the company when he obtained his judgment, he can raise the question of fraud as against the subscribing stockholders; but he can rely upon one kind of fraud only, that is actual fraud and not legal or constructive fraud. (Cases *infra* and in former briefs.) The plaintiff's whole complaint is upon the theory of actual fraud. He alleges "that the capital stock of the said company was a sum grossly and fraudulently in excess of the true value thereof, * * * and that the transactions with Pardee were with the fraudulent intent of relieving themselves of any personal liability, etc." (Record, page 5, line 11.) Again, he alleges, "a gross and fraudulent valuation of the property." (Record, page 6, line 8.) In order to charge these defendants in a creditor's bill it is necessary to allege and prove actual fraud. (*Fort Madison Bank* v. *Alden*, 129 U. S. 327; *Whitehill* v. *Jacobs*, 75 Wis. 474, 20 Atl. 250; *Coit* v. *Amalgamating Co.*, 119 U. S. 343; *Fogg* v. *Blair*, 139 U. S. 118, and cases cited in former briefs.) Actual fraud was attempted to be alleged, but, on the authority of *Fogg* v. *Blair, supra*, it would seem was insufficienty alleged. There is no finding of actual fraud. The jury indeed found that there was not

actual fraud in finding No. 6. This finding the court set aside and did not find upon this subject at all. This question we can raise at this time. (See a following paragraph in this brief.) The only finding which respondent can construe as being a finding of fraud was that there was an over-valuation of the property for which the stock was given. Overvaluation of the property is not actual fraud, and a find-ing to that effect is not a finding of actual fraud, but such fact is only evidence tending, perhaps strongly, to prove actual fraud. (See cases last above cited and cases in former briefs; also *McFadden* v. *Mitchell*, 54 Cal. 629; *Young* v. *Erie Iron Co.*, 65 Mich. 111; *Jamison* v. *King*, 50 Cal. 132.) There-fore, if gross overvaluation is strong evidence tending to prove actual fraud, if a finding of actual fraud had been made it might have supported the judgment. If a finding of no actual fraud had been made, as it was by the jury, we would have been entitled to judgment, but no such finding was made either way.

Again, we made another request for a finding as to actual fraud when we requested the court to give the following: "When the defendant Clark took part in the action of the trustees of the company at the meeting held on December 19, 1889, in passing resolutions and proceedings there had, did he do so with the fraudulent intention or purpose of relieving himself or other stock purchasers from a personal liability on the stock that he or they might acquire?" This requested finding was still more explicit on the question of fraud than No. 6, for the reason that before the word "intention" was placed the word "fraudulent," which does not appear in No. 6. This finding the court refused altogether. We concede that the authorities which respondent's counsel cites support his statement that where there is no express finding upon an issue of fact, it is deemed to be found by the court to support the judgment. But here the situation is quite different; we expressly requested findings upon the matter of actual fraud and the court denied them. We come under the provisions of Section 1114, Code of Civil Procedure, as follows: "No judg-

ment shall be reversed on appeal for want of findings at the instance of any party who, at the close of the evidence and argument in the case, shall not have requested findings in writing and had such request entered in the minutes of the court." This section was construed, and this subject passed upon fully, in *Estelle* v. *Irvin*, 10 Mont. 509. It is evident that this was one of the material issues in the case, and we are unable to find a legal reason for its omission by the court. The rights of the parties demanded that this matter should be passed upon so that the litigation growing out of the controversy might be finally determined. * * * In *North* v. *Peters*, 138 U. S. 271, Mr. Justice Lamar, in the opinion, said: "In the case of *Dole* v. *Burleigh*, 1 Dak. 227, on which counsel for appellant mainly relies, the trial court omitted to find upon a material issue presented by the pleadings, but it made no additional findings. The court laid down and applied the long established principle, nowhere controverted, that the findings of fact by a court, like a special verdict, must decide every point in issue, and that the omission to find any material fact in issue is an error which invalidates the judgment." Our statute has affixed to this doctrine the following restrictions: "No judgment shall be reversed on appeal, for want of a finding in writing, at the instance of any party who at the time of the submission of the cause shall not have requested a finding in writing, and had such request entered in the minutes of the court."

Reply of respondent to argument of Hon. W. H. DeWitt: As pointed out in the reply of respondent to appellant's supplemental brief, if the appellant desired to raise in this court the question that there is no finding on a material issue, he must proceed according to the provisions of Sections 1114, 1115 and 1116, Code of Civil Procedure. He must, at the close of the evidence and the argument, have requested findings and had such request entered in the minutes. (Sec. 1115.) This provision probably refers to a general demand for written findings and not to specific request for a special finding on

any particular issue. He must, however, if he contends that the findings are defective (not sufficiently full) designate to the court the particular point or issue on which he desires a finding; and upon failure of the court to remedy the alleged defect, he may have a bill of exceptions, reciting the proceedings. (Sec. 1115.) And those exceptions must be filed in the court and served on the attorney of the adverse party. (Sec. 1116.) It cannot even be pretended that this course was pursued. There is no bill of exceptions in this record. There can be no pretense that any attempt was made to comply with this statute. Other exceptions taken at the trial may be settled under the provisions of Section 1155, ten days after notice of the entry of judgment being given to propose a bill. But in this case the complaining party has five days after notice of the filing of the findings within which to file his exceptions. This is no "error in law occurring at the trial," etc., to be reviewed on a statement on motion for a new trial. The trial is over, the evidence all in, and the arguments made; nothing remains but for the court to make and announce his decision. Such an alleged error cannot be reviewed on a statement on motion for new trial. (*Pralus* v. *Mining Co.*, 34 Cal. 558.) It is only error in law occurring at the trial that can be so reviewed. (*Scherrer* v. *Hale*, 9 Mont. 63; *Powder River Cattle Co.* v. *Custer County*, *Id.* 145.) This is an error occurring after the trial, there is a special statutory method prescribed for reviewing it and this must be pursued or the alleged error is unavailing. (Hayne on New Trial and Appeal, 239; *Hidden* v. *Jordan*, 28 Cal. 305; *James* v. *Williams*, 31 Cal. 213; *Brooks* v. *Calderwood*, 34 Cal. 566; *Hurlbut* v. *Jones*, 25 Cal. 230; *Lucas* v. *City*, 28 Cal. 598.) It appears from the opinion in *Estill* v. *Irvine*, 10 Mont. 509, that a bill of exceptions presenting the alleged error was settled and it was upon such bill that the review was made. No exceptions of this character were ever served on the respondent's attorneys, as required by Section 1116. The request to the court to submit certain questions to the jury cannot be alleged as error. The court is at liberty to

submit such questions as he pleases to the jury.   He need not
submit any at all.   Error cannot be predicated upon his actions
with or toward the jury in an equity case.   (*Leggatt* v. *Leg-
gatt,* 13 Mont. 190; *Zickler* v. *Deegan,* 16 Mont. 198; *Mer-
chants Bank* ·v. *Greenhood,* 16 Mont. 395; *Galvin* v. *Palmer,*
113 Cal. 46.)   The court had a perfect right to reserve for
his own determination the question appellant asked that the
jury pass upon, provided it should in his judgment be ma-
terial.   And it is not a compliance with the statute for the
party to write out a finding and ask the court to find it.   He
must simply indicate to the court the point on which he de-
sires a finding, leaving the court to find whichever way he
chooses.   (*Edgar* v. *Stevenson,* 70 Cal. 286; *Miller* v. *Steen,*
30 Cal. 408; *Richardson* v. *Eureka,* 42 Pac. 956–966.)   And
the objection that the court has made no finding on any par-
ticular issue cannot possibly be made until after the findings
of the court have been filed.   (*Cowing* v. *Rogers,* 34 Cal.
648–652.)   (No request of any kind was made after the court's
findings were filed nor was there then any objection made to
court's failure to find.)   Wherefore, *a fortiori,* an objection
of this kind cannot be reviewed as an error of law occurring
at the trial.   The trial is then certainly over.   But the re-
quest must be to find some ultimate material fact.   No other
findings are necessary or proper.   (Hayne on New Trial and
Appeal, 239.)   Requests to find facts evidential in their char-
acter are properly refused.   (*Faxon* v. *Mason,* 27 N. Y. S.
1025.)   The ultimate fact here is whether the stock is unpaid
or not, and the finding requested is not of that ultimate fact.
At best it is only evidentiary.   (*Coleman* v. *Howe,* 154 Ill.
471; *Goodrich* v. *Dorman,* 14 N. Y. S. 879.)   In fact all the
fraud required to be established follows as a conclusion of law
from the two facts expressly found by the court, that the
property was overvalued and that the trustees knew it.
(*Douglas* v. *Ireland,* 73 N. Y. 100; *Iron Co.* v. *Drexel,* 90
N. Y. 87; *National T. W. Co.* v. *Gilfillan,* 124 N. Y. 302.)
So if the want of findings could be urged, they will be found
all that is required.

The statute of limitation proposition is answered by *Hawkins* v. *Glenn*, 131 U. S. 319; *Scoville* v. *Thayer*, 105 U. S. 143; *Hospes* v. *Car Co.*, 50 N. W. 1117; Thompson on Liability of Stockholders, 291. The liability is not direct and primary; it is secondary, and the stockholders can be resorted to only when the corporation is insolvent. The cause of action does not arise until execution is returned unsatisfied. (Thompson's Commentaries, 3770.) There is not even a liability to the corporation until a call is made. The want of such a call is sometimes interposed as a defense to these actions, but not being urged is not discussed. It may be said, however, that the rulings are to the effect that the judgment herein takes the place of a call. The liability declared by Section 457 is merely declaratory of the common law liability. (Thompson on Stockholders, 37.) But the liability allowed by the common law to incorporators issuing stock in payment for property, or rather taking property in payment for stock, is narrowed by the provisions of Section 458. (*Gamble* v. *Water Co.*, 123 N. Y. 107.) No action of law could be maintained. Some states have made provision for a special statutory action, Missouri, for instance. But in the absence of statutes containing specific provisions on the subject, and prescribing the remedy, according to the weight of authority, creditors of the corporation must exhaust their remedies against the corporation and its assets before proceeding against the shareholders upon their statutory liability. (Spelling on Corporations, 904; and cases cited, including *Bank* v. *Francklyn*, 120 U. S. 747.) Herein lies the answer to the plea of the statute of limitations. If the statute dated from the time of the injury, then we must have been able to institute action next day. But we had no cause of action until we got judgment against the corporation and exhausted its assets. (Thompson's Commentaries, 3521, 3351; *Thompson* v. *Reno Bank*, 3 Am. St. Rep. 797, and extensive notes.) In California the rule is different, because the liability created by their statute is essentially different from that created by ours. The California liability is direct, absolute, unconditional.

The corporate assets need not be first resorted to.    The stockholder can be sued at once for whatever liability he is under.

HUNT, J.   Appellant's counsel, in their opening brief, declare they find difficulty in telling whether the respondent's action was brought upon the theory that defendant was liable, as a subscriber of stock, for the difference between what he actually paid therefor and the par value thereof, or whether it is sought to charge appellant with fraud, as a director of the company.    This difficulty arises, argue counsel, because it appears by the complaint that the theory of respondent is that the trustees fraudulently, and to relieve themselves of personal liability, caused all the capital stock to be issued to Pardee in payment of the property, which they claim was of the value of only $75,000.    Counsel say:    "Actual fraud" is charged, but, because it is not alleged or proved how Kelly was put in any different position by reason of the issuance of the stock in payment of the property in excess of its actual value than he otherwise would have been, they conclude no damage was proved to have come to him.    Solution of this difficulty being of importance, an examination of the findings of the jury is appropriate in order to understand the exact facts to which must be applied the principles that should control.

Considerable testimony was heard bearing directly upon the issues submitted to the jury, and the following facts were found:

(1)    That the trustees of the corporation, when they directed the issuance of 750,000 shares of stock in payment of a seven-eighths interest in the mine, did not actually believe that the said interest was worth the par value of said stock, namely, $7,500,000.

(4)    That the par value of the seven-eighths interest in the mine at the time of the purchase by the trustees of the corporation was $125,000.

(5)    That the trustees of the corporation, at the time they agreed to issue all of the stock of the company to Pardee et

al. in payment of a seven-eighths interest in the mine, knew, or might have ascertained by the exercise of reasonable diligence, that the par value of the stock paid for such interest was in excess of the actual value of the property purchased.

(6)    That the defendant Clark, in taking part at the meeting of the trustees of the corporation held on December 19, 1889, did not participate therein with the intent to relieve himself or other stock purchasers from a personal liability to the stock that he or they might acquire.

(7)    That from information of the mine that defendant Clark had on December 19, 1889, there was no reasonable ground to believe that a seven-eighths interest was apparently worth the amount of the par value of the shares.

(8)    That Clark at that time did not honestly believe that a seven-eighths interest in the mine was apparently worth the amount of the par value of the shares.

(9)    That the apparent value of a seven-eighths interest in the mine at that time was not the amount of the par value of the shares.

(10)    That the defendant Kleinschmidt, in participating at the meeting of the corporation of December 19, 1889, did not intend to relieve himself or other stock purchasers from a personal liability on the stock that he or they might acquire.

A motion was made to the district court to reject the findings of the jury, with the exception of those numbered 6 and 10. This was denied, and all the findings of the jury were adopted by the court except 6 and 10, and in addition the court found as follows:

(11)    That all of the stock of the corporation standing in the name of Kleinschmidt, with the exception of 250,000 shares, were held by him as trustee for Pardee, under the trust agreement referred to in the complaint.

(12)    That the remaining 250,000 shares held by said Kleinschmidt were held by him as trustee for the company, and were treasury stock, donated to the corporation by Pardee at the first meeting of its board of trustees after the agreement between him and the company by which the entire issue of the

capital stock was to be paid to him for a seven-eighths interest in the mine.

(13)   That all the stock issued to Kleinschmidt was issued to and stood on the books of the company in the name of T. H. Kleinschmidt, trustee, and that the trust in Kleinschmidt for Pardee and the company was created by direct resolution and previous authority of the company itself, and that the company was privy to the creation of both trusts.

The learned judge who presided at the trial of the case drew the following conclusions of law: (1) That defendants Klein-schmidt and Seligman were not liable for the claim of the plaintiff; (2) That the defendant Clark was liable.

What led to the exoneration of any defendants other than Clark is immaterial. The case before us presents for consideration Clark's attitude only.

We regard this action as one brought to collect from Clark, a stockholder in the Fourth of July Mining Company, a corporation organized under Chapter 25 of the Fifth Division of the Compiled Statutes of the State of Montana (1887), the amount of a judgment debt against the corporation, under the provisions of section 457 of chapter 25.

That section provides as follows:   "The stockholders of every company incorporated under the provisions of this article (chapter) shall be severally and individually liable to the creditors of the company in which they are stockholders, to the amount of unpaid stock held by them respectively, for all acts of and contracts made by such company, until the whole amount of capital stock subscribed for shall have been paid in."

The respondent's complaint is in the nature of an equitable petition, instituted in behalf of himself and all the creditors of the corporation, upon the ground that defendant holds a large amount of unpaid stock, and that by the statute he is individually liable to the amount of such unpaid stock for the acts of and contracts made by the Fourth of July Company, until enough of the capital stock held by him shall be paid in to satisfy respondent's claim. That such is the main theory

upon which the respondent proceeded is evident by the plead-
ings, by the evidence, and by the judgment. The complaint.
substantially averred that defendant Clark owned 173,800
shares of the stock of the company; that 750,000 shares were.
transferred for a seven-eighths interest in a mine, worth no
more than $75,000; and that the trustees, of whom defendant
was one, knew, at the time of the conveyance of the mining·
interest referred to, that such seven-eighths interest was worth
no more than $75,000; that the defendant and certain others,
knowing that the mine was not worth more than $75,000,
agreed to organize the corporation, and that the capital stock
thereof should be $7,500,000; that each member of such asso-
ciation agreed to take, and did take, a certain number of
shares in the company, at 25 cents per share; that defendant,
having taken his shares with the full knowledge that the par
value of the stock exchanged for the mining property was
grossly in excess of the true value of the property, and, hav-
ing full knowledge of the transaction antecedent to the issu-
ance of the stock, thereby became the holder of unpaid stock
except in the proportion of $75,000 to $7,500,000. The
prayer is to have defendants decreed to be holders of unpaid.
stock, and that they each pay into court the amount to which
the stock held by him is unpaid, until enough shall be paid to
satisfy plaintiff's claim.

These allegations were sufficient to permit plaintiff to prove
that the stock had not all been paid in, as required by Section
458, Fifth Div., Compiled Statutes, which is as follows: ''The
trustees of such company may purchase mines, manufactories
and other property necessary for their business, and issue.
stock to the amount of the value thereof in payment thereof,
and the stock so issued shall be declared and taken to be full
stock, and not liable to any further call; neither shall the
holders thereof be liable for any further payments under the.
provisions of section 457 of this chapter; but in all statements
and reports of the company to be published, this stock shall
not be stated or reported as being issued for cash paid into the·
company, but shall be reported in this respect, according to.
the facts.'' (*Boynton* v. *Hatch*, 47 N. Y. 225.)

The findings establish that the stock was not paid in as required, and that the seven-eighths interest in the mine was worth only 1⅔ per cent. of the paid up value of stock exchanged for it. Evidential matters contained in the complaint, reciting the history of the formation of the corporation and the *modus operandi*, are not inconsistent with the theory pursued, and upon which recovery was had. It may be true that plaintiff believed that actual fraud was a necessary element of his case—that is, that, to recover, it was essential to prove that defendant intended, when the exchange of the stock for the mine was made, to relieve himself from personal liability to the stock that he might acquire; but, even so, still plaintiff should not be turned out of court unless actual fraud is necessary in order to prove the statutory liability. If fraud can be proved by showing that the managers of a corporation have advisedly issued stock for property the par value of which stock was known at the time of its issuance to be grossly in excess of the fair value of the property acquired by the company; the plaintiff, in an action to enforce the individual liability of a stockholder who has taken with full knowledge of the state of affairs, can recover upon allegations sufficient to admit such proof, even though he has failed to prove other allegations in his pleading wherein he has charged actual intentional fraud on the part of the shareholder sued. This is upon the principle that if a plaintiff aver more than is necessary, and fail to sustain immaterial and redundant averments, but does prove all the material facts upon which a right to relief is based, and no motion to correct the pleading has been made, it will be treated as sufficient; and the surplus allegations disregarded.

Defendant's counsel, though, exaggerated the difficulty complained of. There was no misunderstanding of the real basis of plaintiff's cause of action when they wrote their supplemental brief, wherein they argue that it appears from the pleadings, and particularly from plaintiff's complaint, that plaintiff did not rely and could not have relied upon the fraud which is made the basis of this action, for the reason that

plaintiff asserts his cause of action against the company is by reason of a judgment, on account of personal injuries. Again, they thus refer to plaintiff's attitude: ''He invokes the rule \* \* \* that the persons who perpetrated the fraud of which he complains are personally liable to him because of the fraud which they perpetrated, and at the same time shows that he could not have relied upon any such fraudulent misrepresentation, and that he could not have been induced to take the company as his debtor or to become the creditor of the company upon the theory that the shares of stock were fully paid up, and that the corporation had $7,500,000 worth of assets.'' Appellant's counsel then argue that plaintiff has not brought himself within the rule of equity which he invokes, but from which he ''has expressly excluded himself by his pleading.''

Respondent is not denied relief in equity. The statute imposing the individual liability upon the shareholder prescribes no remedy, and gives no form of redress. In this respect it differs from somewhat similar laws of several states; for instance, Missouri, where, under Section 2517, Revised Statutes of Missouri, 1889, execution may run directly against a shareholder for his liability on unpaid stock, where a judgment creditor of the corporation has issued execution, and the same has been returned *nulla bona*. But the great current of authority is that creditors in such suits may go into courts of equity, which will afford adequate remedy. (*Norris* v. *Johnson*, 34 Md. 485; *Harris* v. *First Parish of Dorchester*, 23 Pick. 112; *Crawford* v. *Rohrer*, 59 Md. 599; Thompson on the Liability of Shareholders, Sec. 258.)

Having now ascertained that plaintiff and defendant are not far apart in their lines of thought as to the scope of the issues raised by the pleadings and findings, we can proceed upon the deduction that there is no reliance upon actual intentional fraud; that that theory is eliminated from the case; and that, therefore, if the action can be sustained, it must be because fraud upon the law flows as a necessary legal inference from the facts that have been found.

The findings of fact adopted by the court are not attacked

for insufficiency of evidence to justify them. We have, never-theless, scrutinized the testimony in trying to arrive at a proper answer to the main legal proposition necessary to be decided. We have viewed the matter from several stand-points. We have considered that it was a mine that the cor-poration was giving its stock for, and that the purposes of the company were mining; also, that the value of mining property is honestly often immoderately rated by those who estimate its probable value by some slight indication of an ore body of commercial worth. We have considered the showing made by the development work on the property when the corporation was created. We have made every reasonable allowance for the unwarranted hopes of fortune that doubtless filled the minds of the defendant and his associates when they launched their enterprise upon the commercial world. We have even included allowances of fair profit to the promoter in trying to get at the fair value of the entire property as it was turned over to the company. But with all this there is nothing to contradict or shake the effect of the evidence from which it appears so clearly that there was absolutely nothing substan-tial upon which any man possessed of the most ordinary busi-ness capacity could have believed that $7,500,000 was the rea-sonable value of a seven-eighths interest in the Fourth of July Mine. It must therefore stand as true that the property which the corporation received from Pardee as full payment for the stock was worth only $125,000 when turned over to the company.

Authority to trustees of corporations to purchase mines, manufactories, and other property necessary to their business, and issue stock to the amount of the value thereof in payment therefor, which stock so issued shall be declared and taken to be full-paid stock not liable to any further calls, is a specific grant of power to buy any species of property necessary to the business of the company by paying therefor in stock; but, in exercising the authority given, the par value of the stock so issued must be put against the fair value of the property purchased. The language "to the amount of the value

thereof,'' used in section 458, means the actual or the fairly estimated value of the property exchanged for the shares of stock delivered in payment. Constructions of the language quoted which permit any valuation to be put upon the property which the parties to the transaction please, and to issue in payment therefor stock of a par value grossly in excess of the true value of the property, we believe to be evasive and erroneous. The statute neither allows a grossly excessive value to be put upon the property sold in order to deliver it over in consideration of a large amount of stock, the par value of which is far in excess of the fair value of the property, nor does it authorize property to be sold at far less than its value, in consideration of payment in stock worth on its face more than the property so acquired actually or fairly estimated is worth.

Corporations are generally formed to execute undertakings which individuals cannot carry out with safety or facility, and to avoid personal liability in execution of such projects. But the legislature prescribes the terms of the contract entered into between the people and the incorporators. Entire immunity from individual liability is not invariably incidental to the grant of a charter or articles of corporate existence. If legal conditions are complied with by the organizers of corporations, the immunity follows as a matter of law; but, if they are not, an individual liability to the shareholders arises, imposed by the same power which granted the right of corporate existence, and whereby creditors may make their claims good. Such we believe to be the correct rule, and such we think is the doctrine announced by the courts and text writers who have reasoned upon the sounder principles of law. We shall not attempt to do more than cite a few recent cases which sustain our views in clear and unmistakable language.

The supreme court of the United States, by Justice Hunt, in *Upton, assignee,* v. *Tribilcock,* 91 U. S. 45, announced this salutary rule: ''The capital stock of a moneyed corporation is a fund for the payment of its debts. It is a trust fund, of which the directors are the trustees. It is a trust to be man-

aged for the benefit of its shareholders during its life, and for the benefit of its creditors in the event of its dissolution. This duty is a sacred one, and cannot be disregarded. Its violation will not be undertaken by any just-minded man, and will not be permitted by the courts. The idea that the capital of a corporation is a football to be thrown into the market for the purpose of speculation, that its value may be elevated or depressed to advance the interests of its managers, is a modern and wicked invention. * * * The capital paid in and promised to be paid in is a fund which the trustees cannot squander or give away."

Within these principles, many courts of the highest respectability have laid down rules we have stated. The use of the term "trust fund" we approve of as understood by the late decision of the supreme court in *Hollins* v. *Brierfield Coal and Iron Co.*, 150 U. S. 371, 14 Sup. Ct. 127, and as substantially followed by our court in *Ames & Frost Co.* v. *Heslett*, 19 Mont. 188, 47 Pac. 805. Speaking of property held "in trust" for creditors, Justice Brewer said in the federal case cited: "Yet all that is meant by such expressions is the existence of an equitable right which will be enforced whenever a court of equity, at the instance of a proper party and in a proper poceeding, has taken possession of the assets. It is never understood that there is a specific lien or a direct trust." There is no direct and express trust attached to the unpaid liability of a stockholder as an asset of an insolvent corporation; but an equity does arise in favor of a creditor of such a corporation which will be upheld in the creditor's favor, and which will inure to the benefit of the creditor before it will be held to belong to the separate entity, the corporation itself. A simplified way of expressing the attitute of the creditors of a corporation which is insolvent towards the corporation is to say that in such an event "all the creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders." (*Wabash, St. Louis and Pacific Railway* v. *Ham*, 114 U. S. 587, 5 Sup. Ct. 1081.) That the liability for un-

paid stock is an asset of an insolvent corporation has been
frequently decided.    (*Sanger* v. *Upton*, 91 U. S. 56; *Haw-
kins* v. *Glenn*, 131 U. S. 319, 9 Sup. Ct. 739; *Hatch* v.
*Dana*, 101 U. S. 205; Beach on Private Corporations, Sec-
tion 117.)

Judge Peckham, in 1890, announcing the unanimous opin-
ion of the court in *Gamble* v. *Q. C. Water Co.*, 123 N. Y. 91,
25 N. E. 201, construed the manufacturing act of that state,
which is similar to Section 458 of the Montana Compiled
Statutes.    He said:  ''We think that, under the manufac-
turing act, the company cannot issue its stock as full paid at
anything less than its par value.    The act makes special pro-
vision for the exercise of the power to issue stock in payment
for property purchased by the company.    Whatever the right
of a corporation under the general powers pertaining to it as
a corporation might be, we must look to the provisions of the
statute where it specifically grants such power to find the
terms and conditions upon which it is to be exercised.    By
Section 2 of Chapter 40 of the Laws of 1848, the trustees of
a manufacturing corporation, founded under the act, are em-
powered to purchase property necessary for their business,
and to issue stock to the amount of the value thereof in pay-
ment therefor; and the stock so issued shall be declared and
taken to be full paid stock, and not liable to any further calls.
We think this language must mean that the amount of the
nominal or par value of the stock must be put against the
value of the property purchased; otherwise, we should have
such a case as $100 in cash purchasing $100 of stock at par,
under a subscription to the capital stock of the company,
while the same $100, if first turned into property to be sold
to the company, might purchase double the quantity of the
stock if the stock were only of the actual value of 50 per
centum of its par value.    The stock would issue only at its
actual value in return for property, but, in return for cash,
it would only issue at its par value.    In other words, if the
stock were really worth but 50 per cent. of its par value,
actual cash would purchase only half as much stock as could

be purchased with an equal value in property. This was never meant. And I think the expression that the stock thus issued for property purchased is to be taken as full paid up stock, and that it is to be issued to the amount of the property purchased, must mean that it is to be issued at its par value.

"It may be said that this construction prevents a corporation from purchasing property and paying for it with its stock, where actual value of the stock is enough below its par value to make the difference in a large purchase very appreciable. That may be so. But it was undoubtedly the object of the statute to make the full-paid stock that is issued the representative, dollar for dollar, of the money or property that has been paid in for its purchase, so that the company would start off in business with money or property of the full value of its paid-up capital."

The supreme court of Missouri, with no dissent, in the very late case of *Van Cleve* v. *Berkey*, 44 S. W. 743 (decided the same week that the case before us was submitted), in construing a statute permitting subscribers to pay for stock by labor done or property actually received, said: "Where the law permits subscribers to pay for stock by labor done or property actually received, it means that the corporation must receive in labor or property what it was reasonably worth in money. Corporations must own property for the purposes of their legitimate business, and, if a man contracts to take shares in the corporation, he must pay for them, to use a homely phrase, 'in meal or in malt.'" He must either pay in money or in money's worth. And it is the rule laid down by the supreme court of this state, which the learned referee seems to have overlooked, that the property or labor turned into the corporation as payment for shares of stock must be a fair, just, lawful, and needed equivalent for the money subscribed."

In *Wallace* v. *Carpenter Electric Heating Manufacturing Co.*, 73 N. W. 189, decided in December, 1897, the supreme court of Minnesota used the following apt language: "A certificate for paid-up shares in a corporation is simply a written statement in the name of the corporation that the holder

thereof is a stockholder, and that the full par value of his shares has been paid to the corporation. If the shares in fact have not been so paid for, the certificate that they have been is a false representation that the assets of the corporation have been increased to the amount of the par value of the stock so issued. And, when a corporation represents that it has a paid-up capital of a given amount, it represents to the business world that, at the time it issued the stock, it received money or property to the full par value of its stock. The issuing of the stock of a corporation as paid up when it is not so in fact is a public and a private wrong—a cheat and a fraud —which enables the corporation to obtain credit and property by false pretenses. Ethically the legislature might, with the same propriety, authorize an individual to misrepresent his assets for the purpose of obtaining credit as to authorize a corporation, other than a mining corporation, to issue watered stock. ''

In *Stout* v. *Hubbell*, 73 N. W. 1060, decided after the case at bar was submitted, the supreme court of Iowa said: ''For this court has held, as to creditors of a corporation, that when property is received by the corporation, at an excessive valuation, in payment for shares of its capital stock, it is only a payment to the extent of the value of the property received, and that owners of such stock are liable to creditors for the difference between the actual value of the property and the face value of the stock.''

To like effect are the somewhat older but modern decisions in *Elyton Land Co.* v. *Birmingham Warehouse & Elevator Co.*, 92 Ala. 407, 9 South. 129; *Wetherbee* v. *Baker*, 35 N. J. Eq. 501; *Bailey* v. *P. & C. Coal & Coke Co.*, 69 Pa. St. 334; *Douglass* v. *Ireland*, 73 N. Y. 100; *Goodrich* v. *Dornan*, 14 N. Y. Supp. 879; *Roman* v. *Dimmick*, (Ala.) 22 So. 109.

There have been numerous contrary decisions, a leading case being *Phelan* v. *Hazard*, 5 Dill. 45, Fed. Cas. No. 11,068, cited to us by appellant. But, not stopping to distinguish the cases, the courts of the United States have not of late followed

*Phelan* v. *Hazard*; and we believe it can be safely said that there has been a steady advance in later years to the view that, in exchanging stock for property under a statute similar to section 458, each must be valued honestly at its fair worth, and the amount of stock issued as paid up shall not be greater than the value of the property purchased.

This brings us to the contention that there can be no liability unless it is proven that the shareholder, in assenting to the purchase of property for stock and the overvaluation thereof, and in capitalizing the enterprise, actually intended to perpetrate a fraud upon the creditors of the corporation; in other words, that he intended actually and by furtive motive to perpetrate a fraud. Bearing in mind always that this appellant, Clark, was one of the original parties to the purchase of the mining property referred to in the findings, and actively participated as a trustee in the company formed, and immediately thereafter became a stockholder, with full knowledge of the fact that the stock had been paid for by a seven-eighths interest in the mine, which was knowingly grossly overvalued, the application of the law becomes quite simple. Upon this question, too, there are decisions in support of the appellant's theory, but again we shall curtail the results of our investigation by observing that in the later opinions those principles obtain which we believe to be the more just to creditors generally. Upon what rational basis can it be said that the trustees or shareholders of a corporation have a right to deliberately take, in payment for the stock of the company, property intentionally and most unfairly overvalued? Where is the authority to do it? What the justification for it in the code to which the trustees must turn? These questions are not replied to by saying that the common law permitted such a practice; for, if it did, Section 458 of the Laws of Montana (Compiled Statutes 1887), and the constitution (section 10, article 15), do not. Certainly, the common law did allow directors of a corporation to receive property or services in payment for stock, either from original subscribers or from those to whom the original subscribers sell stock; but whether the

common law sanctioned an intentional gross overvaluation of property sold for stock in the corporation is, at least, doubtful. To pursue that inquiry, however, is not important, for the statute (section 458) is the specific grant of power under which the conditions are prescribed as to when the stock is paid up when it has been issued for property, and to that directors and shareholders must look for a guide in their conduct in and about such transactions, while section 457 creates the liability.

In *Terry* v. *Little*, 101 U. S. 216, Chief Justice Waite said: "The individual liability of stockholders in a corporation is always a creature of statute. It does not exist at common law. The first thing to be determined in all such cases is, therefore, what liability has been created?"

In *Camden* v. *Stuart*, 144 U. S. 104, 12 Sup. Ct. 585, Justice Brown clears up evident misapprehension of the former decisions of that court by the following statement: "In view of our decisions in *Sawyer* v. *Hoag*, 17 Wall. 610, *Scovill* v. *Thayer*, 105 U. S. 143, and the numerous cases arising out of the failure of the Great Western Insurance Company, it is manifest that the resolution adopted at the directors' meeting of December 29, 1880, that, upon paying $4,000 or their proportions of the same, the capital stock of $150,000 should be deemed to be fully paid, was wholly ineffectual as against the creditors of the company. It is the settled doctrine of this court that the trust arising in favor of creditors by subscriptions to the stock of a corporation cannot be defeated by a simulated payment of such subscription, nor by any device short of an actual payment in good faith. And, while any settlement or satisfaction of such subscription may be good as between the corporation and the stockholders, it is unavailing as against the claims of the creditors. Nothing that was said in the recent cases of *Clark* v. *Bever*, 139 U. S. 96, 11 Sup. Ct. 468, *Fogg* v. *Blair*, 139 U. S. 118, 11 Sup. Ct. 476, or *Handley* v. *Stutz*, 139 U. S. 417, 11 Sup. Ct. 530, was intended to overrule or qualify in any way the wholesome principle adopted by this court in the earlier cases, especially as

applied to the original subscribers to stock. The later cases were only intended to draw a line beyond which the court was unwilling to go in affixing a liability upon those who had purchased stock of the corporation, or had taken it in good faith in satisfaction of their demands."

And in *Lloyd* v. *Preston*, 146 U. S. 630, 13 Sup. Ct. 131, it was held a *bona fide* creditor of a corporation could enforce actual payment by the subscribers to the capital stock of the company where the evidence was convincing that the overvaluation of the property transferred to the railway company in pretended payment of the subscription to the capital stock was so gross and obvious as, in connection with other facts, clearly established a case of fraud.

It is not necessary to show an actual fraudulent intent in order to establish a legal fraud. "Simulated payments," as the supreme court in *Handley* v. *Stutz*, 139 U. S. 417, 11 Sup. Ct. 530, calls payments of subscriptions to capital stock where property is grossly and obviously overvalued, do not constitute excuses for defeating the trusts arising in favor of the creditors of a corporation.

The quantum of proof essential in actions similar to this one has been directly considered by several courts. In *Douglass* v. *Ireland*, 73 N. Y. 100, it was said: "A deliberate and advised overvaluation of property  *  *  *  is a fraud upon the law.  *  *  *  It is in a direct violation of the policy as well as the terms of the law, which demand payment either in money or property at its value of all the capital stock of the company as a condition of immunity to the stockholders from liability for debts of the corporation. The payment of an amount for property in excess of its value does not depend upon any fraudulent intent other than that which evidenced by the act of knowingly issuing stock for property to an amount in excess of its value. All that is necessary to establish the legal fraud and take the stock issued out of the immunity assured to stock honestly issued  *  *  *  is to prove two facts: (1) That the stock issued exceeded in amount the value of the property in exchange for which it was issued, and (2)

that the trustees deliberately, and with knowledge of the real value of the property, overvalued it, and paid in stock for it an amount which they knew was in excess of its actual value.''

The property in that case was worth $68,000, the capital stock issued being $300,000. This case last cited was approved of in the later case of *National Tube Works Co.* v. *Gilfillan*, 124 N. Y. 302, 26 N. E. 538. There the property was found to be worth $75,000, but it was procured by giving $300,000 worth of stock for it. The court approved of a ·charge to the jury directing them that ''the fraud is consummated by the issue of stock as full-paid stock which has not been fully paid; and it does not depend upon any fraudulent intent other than that which is evidenced. by the act of knowingly issuing stock for the property in an amount in excess of its value. All that is necessary to establish legal fraud is proved in two facts,'' etc. .The court even went to the extent of holding that there is ''no exemption from liability because ·credit was imprudently given by the creditor, or because he .supposed that the property of the corporation was sufficient to pay its debts.''

The New York cases are approvingly upheld in the very .able opinion of the supreme court of Missouri in *Van Cleve* v. *Berkey, supra,* where the court said it was satisfied that the weight of·American authority was against the appellants' contention on the facts of that case, and that the appellants were liable without other proof of fraud than was afforded by the transaction itself. The transaction spoken of was this: A corporation was organized under the laws of Illinois, and was to have a capital of $100,000, subscribed by the parties in interest to whom the full amount of stock as subscribed was issued as full paid, in consideration of a transfer to the corporation of an invention of little actual value. The evidence showed that all the defendants acted in good faith so far as their actual intentions were concerned, and none of them was moved by any actual fraudulent intent in the transaction. ·About 10 per cent. of the amount subscribed was advanced by the original subscribers, but one B. received $90,000 of the capital stock of the corporation for an invention.

Upon the question of fraud the case is parallel to this. The court also adopts the language of the supreme court of Alabama in *Elyton Land Co.* v. *Birmingham Warehouse & Elevator Co.*, 92 Ala. 423, 9 South. 129, disapproving of the statements made by Mr. Cook, in section 47 of his book on Stocks, Stockholders and Corporation Law, to the effect that attempts made, in instances where stock was issued for the property taken at an overvaluation, to hold the party reciving such stock liable for its full par value less the actual value of the property received from him, have usually been unsuccessful.

The supreme court of Nebraska, in *Gilkie and Anson Co.* v. *Dawson Town & Gas Co.*, 64 N. W. 981, expressly lay down what is sufficient proof in accordance with the New York decisions.    Judge Harrison, for the court, said:    "Where an agreement is made whereby stock is knowingly and advisedly issued as paid in full, though but partially paid for, it may be set aside by creditors, and the enforcement of payment in full of the subscription for the stock obtained for the satisfaction of the debts of the corporation.    *    *    *    Where property is conveyed to a corporation as payment of a subscription for stock, it is insufficient to satisfy the liability of subscribers to the creditors of the corporation if there has been a fraudulent overvaluation of the property—an over valuation knowingly and advisedly made."

Clark on Corporations, in a logical discussion of the proposition, says that the better opinion is that an actual fraudulent intent need not be shown in order that the person who pays for his stock in property may be held liable to creditors on the ground that the property was overvalued.    His summary of the law is as follows:    "Laying aside all questions as to whether there is an actual intention to defraud, such transaction would be a fraud in law, both upon dissenting stockholders and upon persons dealing with the corporation on the faith of its stock being fully paid up, and it would be just as invalid as against creditors as a payment for stock in money at a discount.    If the nature of the property and the extent

of the overvaluation are such that the overvaluation may possibly have been due to error of judgment, then, to render the transaction invalid as against creditors, actual fraud must be shown, and the question is one of fact.    If, on the other hand, the overvaluation is so gross and obvious that it could not have been due to mere error of judgment, the transaction will be held fraudulent as a matter of law.    This seems to be the fair result of the cases, if the opinions are read in the light of the facts actually before the court.''

In *Northwestern Mutual Life Ins. Co.* v. *Cotton Exchange Real Estate Co.*, 46 Fed. 22 (decided in 1891), a bill was brought by a judgment creditor of a corporation, alleging, in substance, that the stock of the corporation of the value of $125,000 was paid by conveying a lot and building at a valuation of $200,000, but which in reality was only worth $157,-000.    The bonds of the corporation, secured by mortgage on the building, were issued to the defendants to make up the deficit, the defendants being stockholders and directors in the company which owned the building and made the conveyance, and they personally knew of the overvaluation, and were benefited by it.    The same arguments were advanced before Judge Thayer that are usually advanced in like cases, namely, that the bill did not show that there was any fraud in the transaction by which the stock was paid for, inasmuch as it did not aver that the stock was intentionally overvalued.    Judge Thayer decided that the persons to whom the stock was issued were aware of the overvaluation, and, although the bill was said to show no actual fraud in the transaction, the court regarded an intentional overvaluation of property to the extent and made under the circumstances disclosed by the bill as fraudulent, ''in the sense that a complainant is bound to allege and prove fraud.   *  .*  *   The law regards such a transaction as constructively fraudulent so far as the corporation's creditors are concerned; or,. to state the proposition in a different form, the payment of a stock subscription in such manner and under such circumstances is invalid, and not binding on a creditor of the corporation, and, where the law de-

termines the quality of a transaction described in a pleading, it is unnecessary to aver that it was invalid or fraudulent.'' The learned judge who decided the last referred to case had before him, and which was binding upon him, the case of *Coit* v. *Gold Amalgamating Co.*, 119 U. S. 343, 7 Sup. Ct. 231 (decided in 1886), which is quoted as holding to the doctrine that actual fraud, as heretofore defined, must be shown by a creditor seeking to fix the individual liability of a shareholder. But it is plain that nothing in that decision was regarded as inconsistent with the rule laid down in the New York decisions heretofore cited. *Coit* v. *Gold Amalgamating Co.* was an action by a judgment creditor against the defendant company to compel the stockholders to pay what he claimed was due and unpaid on the shares of the capital stock held by them. The capital stock was fixed at $100,000 and the property was turned over for that amount of stock. It was said that, although ''the corporators may have placed too high an estimate upon the property, its valuation was honestly and fairly made.'' The court, after saying that, where full-paid stock is issued for property received, there must be actual fraud in the transaction to call stockholders to account, added: ''A gross and obvious overvaluation of the property would be strong evidence of fraud.'' We fail to see where this language at all conflicts with the opinion of Judge Thayer in *Northwestern Mut. Life Ins. Co.* v. *Cotton Exchange Real Estate Co.*, *supra*, or with our own view that when there is superadded to a gross and obvious overvaluation the element of deliberation in having grossly overvalued the property, and knowledge in having done so, fraud is a necessary legal inference from such facts, for in such a case good faith in valuing the property is entirely wanting. It is a fraud upon the law.

So, also, in *Thayer* v. *El Pomo Mining Co.*, 40 Ill. App. 344, it was decided that the stockholders in an insolvent corporation were liable to creditors unless they had given for their stock ''the equivalent of money or in money's worth.'' That was a mining case, and the corporation was organized with a capital of $1,000,000, divided into $10 shares. The appel-

lant recovered a judgment against the corporation, which, being unsatisfied, he sought to make good under the statutes making the stock of shareholders liable. The property transferred to the corporation was worth but little more than 10. per cent. of the amount of the stock of the company. There, as in the case at bar, it was considered a fair conclusion that, none of the incorporators had any idea that the property was worth a million dollars, but adopted that sum as a convenient one for the amount of stock to be issued. As between themselves, connected with the organization, the court said there could be no ground of complaint; but, as to creditors, the law regarded the nominal capital of the company, besides its actual assets, as a fund to which they might look for satisfaction. From many former cases in Illinois the rule was deduced that the stockholders of an insolvent corporation will be liable to creditors unless there has been given for the stock the equiv alent of money or in money's worth. ''No fiction,'' say the court, ''however innocently adopted, is a defense against cred itors.'' In the latest decision in Illinois (1895)—*Coleman* v. *Howe*, 154 Ill. 458, 39 N. E. 725—entire good faith in valu- ing property is required, and ''where the overvaluation is so. great that the fraudulent intent appears on its face, and is not explained, the court will hold it to be fraudulent, as a matter of law.''

In *Elyton Land Co.* v. *Birmingham Warehouse & Elevator Co.*, *supra*, it was held that the absence of fraudulent motive. on the part of a trustee does not give validity to a mere simulated execution of the trust. An averment of fraud in refer-. ence thereto is unnecessary.

In the expression of the foregoing views of our own and those adopted by us from other courts, we do not mean to be understood as going to the extent of holding that a stock-. holder may be successfully charged by a creditor of a corporation as a holder of unpaid stock where the property given in exchange for the stock does not eventually prove to be as; valuable as it was believed to be at the time of the transfer, nor that unwise judgment or indiscretion alone are sufficient.

The judgment of men is too apt to be erroneous in relation to the valuations of property. This is especially true in new countries, where mining excitements frequently prevail, and values fluctuate rapidly and to an unusual extent. An honest mistake of judgment would seem to be a complete defense to such an action, but no such feature is presented in the case under consideration. Good faith in the valuation put upon the property is what the law demands, and all that it demands. By good faith is meant actual belief in the value put upon the property—the belief that a prudent and sensible business man would hold in the ordinary conduct of his own business affairs. Beliefs based upon visionary speculative hopes, unwarranted by existing conditions or facts, and without reasonable evidence from the then present appearances, are not such beliefs as will relieve the shareholders. Such is the true rule, we think, and such is the one that the law intends shall be applied.

Higher authority than the statutes also exists to prohibit a corporation's issuing stock except for property actually received. The constitution of the state (section 10, art. 15) provides as follows: "No corporation shall issue stocks or bonds, except for labor done, services performed, or money and property actually received; and all fictitious increase of stock or indebtedness shall be void. The stock of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding a majority of the stock first obtained at a meeting held after at least thirty days' notice given in pursuance of law."

In *Elyton Land Co.* v. *Birmingham Warehouse & Elevator Co.*, *supra*, a clause in the constitution of Alabama, almost identical with section 10 quoted, was construed as effective against transfers of property deliberately and intentionally overvalued to corporations for their stock. We approve of this construction.

The constitution of Missouri (art. 12, section 8) contains a substantially similar clause; and in *Van Cleve* v. *Berkey*, *supra*, the supreme court decided it applied to a case like the

one before us, saying:    "It is impossible to escape the con-
viction that in this state, whatever may be the case in some of
the other states, the 'American trust doctrine,' as suggested
by Mr. Justice Harlan, has indeed been re-enforced by its
constitution and statutes, and that the proposition that the
stock of a corporation must be paid for 'in meal or in malt'—
in money or in money's worth—is not a mere figure of speech,
but really has the significance of its terms; it may be paid for
in property, but in such case the property must be the fair
equivalent in value to the par value of the stock issued there-
for; that it is the duty of the stockholders to see that it pos-
sesses such value; that when a corporation is sent forth into
the commercial world, accredited by them as possessed of a
capital in money, or its equivalent in property, equal to the
par value of its capital stock, every person dealing with it,
unless otherwise advised, has a right to extend credit to it on
the faith of the fact that its capital stock has been so paid for,
and that the money, or its equivalent in property, will be
forthcoming to respond to their legitimate demands—in short,
that it is the duty of the stockholder, and not the creditor, to
see that it is so paid."

Earnestly have appellant's counsel sought to convince us
that mining corporations are *sui generis*, and that the doctrine
of liability of shareholders for unpaid subscriptions, when
stock has been issued for property at an overvaluation, is not
applicable to such bodies.    To fortify their arguments, they
rely upon Judge Hoffman's opinion *in re South Mountain
Con. Min. Co.*, 7 Sawy. 30, 5 Fed. 403, and the opinion by
Judge Sawyer in the same case, reported again in 8 Sawy.
366, 14 Fed. 347.    The foundation of Judge Hoffman's re-
marks is based upon two notions:    (1) That the amount of
the capital stock of a mining corporation is usually fixed at a
purely arbitrary sum, and divided into as many shares as con-
venience or caprice may dictate; and (2) that the capital stock
of a mining company neither bears nor is intended to bear the
slightest relation to the real value of the property,—"a value
nearly always conjectural, and very often imaginary."    A

complete answer to both points lies (1) in the constitutional provision of this state which says that "no corporation shall issue stocks except for  *  *  *  money or property actually received;" and (2) in the law (Section 458, Fifth Division of the Compiled Statutes 1887) wherein the grant of power to the trustees of a corporation to purchase mines  *  *  * necessary for their business enables them to issue stock to the amount of the value thereof, which stock so issued shall be declared and taken to be the full-paid stock, and not liable to any further call.    There was no such statute in California when the cases cited were decided, and, so far as we are advised, it does not appear that the court considered the effect of the constitutional prohibition of that state (Section 11, Article 12) against issuing stock except for property actually received. Judge Sawyer also wrote of the common custom, and said that mining corporations in California were organized and carried on upon principles in respect of their capital stock wholly different from banking and like commercial corporations having a subscribed capital stock.    No reference is made to statutory rules fixing liability for unpaid shares, or extending authority to buy mines.    Custom and common knowledge allowed and looked for any capitalization of a mining company, and nothing to the contrary justified the court in holding against the weight of these arguments.    Such is fairly the quite persuasive reasoning of the learned judge.

Morawetz, in his valuable book, cites these two decisions, and sustains their doctrine in the following language:    "While the customs of business men with regard to the methods of organizing and managing particular classes of corporations cannot control the established rules of law, such customs must often be taken into consideration in construing agreements made in view of the prevailing condition of affairs.    Thus, it has long been the general practice both in New York and in California to organize mining corporations with a nominal capital bearing little or no relation to the real capital which the shareholders propose to contribute, and to issue the entire stock as fully paid up in consideration of

mines whose market value is much below the amount of the stock so issued, and whose real value is generally nothing. This practice is so universal and so notorious that a person who contracts with any ordinary mining company may usually be presumed to have contracted with a view only to such security as the property transferred to the company may furnish, irrespective of the capital indicated by its charter. A person so contracting would therefore have no equitable claim against the shareholders for unpaid capital if their shares were declared paid up as between themselves and the company. It is to be observed, also, that the nominal capital of a mining company, by the very nature of the mining business, cannot, as a rule, furnish an indication of the company's actual capital. The property of a mining company is naturally of an extremely fluctuating and uncertain character. Moreover, it is acquired for the sole purpose of being exhausted and distributed among the shareholders in the form of dividends, and not as a permanent fund with which to carry on business." (Morawetz on Private Corporations, § 830.)

The intimation that New York, like California, excepts shareholders in mining corporations from statutory liability, is inadvertent, for *Douglass* v. *Ireland, supra,* involved the responsibility of shareholders in a corporation for furnace and mining purposes. The two California cases alone uphold the text. As said before, however, those cases were not decided on statutes similar to the New York manufacturing act, quoted in *Boynton* v. *Hatch,* 47 N. Y. 225, and identical with the Montana statutes, and for this reason are not wholly pertinent. But we go farther, and are constrained to overthrow their fallacious doctrine of expediency, and to rest our decision upon the law as it is written, and upon the common principles of moral honesty, within its letter and its spirit.

Sifted of specious consideration addressed to judges to regard practices long prevalent in certain mining states, where no laws existed placing mining and manufacturing corporations on an equality, and the warped doctrine we are asked to lay down leads to this: Incorporators of mining companies

should be permitted to violate the law, and deliberately deceive the public, but the incorporators of manufacturing enterprises should not; and this notwithstanding the truth that the same specific statutes grant no greater powers to one than the other, and fix the same liabilities upon the shareholders in each.

Counsel assert positively that there is no such thing as the market value of a mine. This court said in *Montana Railway Co.* v. *Warren*, 6 Mont. 275, 12 Pac. 641, that even a prospect has a value. "The only questions are whether a prospect has a value that may in law be called a market value, and, if so, whether there is proof in this case of any market value. Has a 'prospect'—an undeveloped mine—any market value? A full, positive answer to that is that 'prospects' are sold in the market every day. Certainly, property so sold has a market value. The records of Silver Bow county will probably show more transfers by sale of property, such as is known as 'prospects,' than of any other kind of real estate. They are frequently sold upon execution, foreclosure and partition sales. They are subject to daily litigation in our courts." These remarks were "well said," wrote Justice Brewer in affirming that decision, in 137 U. S. 348, 11 Sup. Ct. 96. Its holding was also followed in *Maloy* v. *Berkin*, 11 Mont. 138, 27 Pac. 442, and *Railway Company* v. *Forbis*, 15 Mont. 452, 39 Pac. 571, and a like rule reiterated in *O'Keefe* v. *Dyer*, 20 Mont. 477, 52 Pac. 196. The rationale of the California cases can also be accounted for, not only by an absence of statutory conditions which confront the incorporators of mining companies in Montana, but by remembering that when the opinions of Judges Sawyer and Hoffman were delivered, in 1881, and 1882, the science of mining in Western America was and had been far behind its present systematism. The engineer of mines was by no means so accessible or so well informed by knowledge of past experience of development in mines in this country as he has since become, and the light of his professional learning was not nearly so universally spread. It was only a few years before

those decisions were pronounced that the universities of America first conferred degrees for proficiency in special courses in mining. In such surroundings, and amid the fewer opportunities for ascertaining with reasonable reliability the value of a mine, the custom of which the California judges wrote sprung up in the early days of California; and, because of its well-known origin and hold, the law and the courts were reluctant to interfere with it. But that it was a pernicious custom is indisputable. It led to deceit, and to fictitious estimates being placed on mining property by the incorporators, for their own gain. Shares in a mine, at a few cents each, allured the unsuspecting and venturesome. The experiences of the custom are filled with disappointment and ruin to investors, rich and poor. All these matters may have been the controlling reason for the adoption of the more honest policy of our laws. Judge Buck, whose opinion as a district judge was read to us on the argument of this case, adverted to the argument of custom in this way: "This custom has made the very word 'mine' in financial centers of the world almost synonymous with conspiracy to defraud. The caution of capital has become so trepid that I believe it is no exaggeration to state that many a half-worked rich mine lies idle to-day in the mountains of this state through this cause alone."

The Supreme Court of Utah, in *Salt Lake Hardware Co.* v. *Tintic Milling Co.*, 45 Pac. 200, makes no exception in favor of mining corporations; nor does the Supreme Court of Illinois, in *Thayer* v. *El Pomo Mining Co.*, *supra;* nor does the Supreme Court of Wisconsin, in *Gogebic Inv. Co.* v. *Iron Chief Mining Co.*, 47 N. W. 726; nor does the Supreme Court of Iowa, in *Oliphant* v. *Mining Company*, 63 Iowa 332, 19 N. W. 212; nor does the Supreme Court of Oregon, in *Hodges* v. *Mining Co.*, 9 Or. 200; nor does the Court of Appeals in New York, in *Douglass* v. *Ireland, supra.*

But, whatever may have been the reason of the old system, things have changed. Estimating the value of a mine is no longer the result of hasty conjecture. Former methods

have given way to scientific tests, based upon geological conditions, underground surveys and measurements, careful examinations of ore in sight, the known history of ore bodies in the vicinity, the method and cost of treatment of the ore, together with facilities for its transportation to markets.   Now, too, there is a known definition of rights which the courts have step by step established in expounding principles by which the miner shall have preserved to him the greatest benefit of his discovery.   These reasons may likewise have weighed with the legislature when it refused to extend greater immunity to stockholders in mining than in certain other corporations formed under the laws of the state.

It is next contended that it does not appear that appellant, Clark, was a subscriber, or had ever agreed to become a subscriber, to any stock.   This is upon the theory that there is no actual contract to pay on the part of the shareholders who accept stock in mining corporations as full paid without having signed a formal subscription for the same.   Section 457, heretofore quoted, imposes the liability of shareholders to creditors to the amount of unpaid stock, for all acts of and contracts made by the company.   Section 458, *supra*, provides that stock issued in payment for the mining property, to the amount of the value of the property, shall not be liable for any further payments under the provisions of Section 457."   To give any effect at all to this clause, stock issued in payment of mining property must be included.   This is obvious.   It cannot mean liability to the shareholder in a manufacturing, and exemption to a stockholder in a mining, company.   Failure to have signed a formal stock subscription list cannot relieve appellant.   The stock was issued to him, and, with knowledge of all the surrounding facts, he became the holder of it.   This was enough.   See the late case of *Smith* v. *Ferris and C. H. Railway Co.*, (Cal.) 51 Pac. 710.   Where stock has been issued, the holder has impliedly subscribed for it.   If it has not been issued, yet he has subscribed to a formal subscription list agreeing to take it, as such subscriber, he may be deemed liable to the amount for which it

is unpaid. (Taylor on Corporations, Section 511.) The Supreme Court of Iowa, in *Jackson* v. *Traer*, 20 N. W. 764, held that the simple acceptance of stock by one who never became a stockholder by subscription rendered the holder liable. Where the person sought to be charged has already taken the stock by an acceptance of the certificates, the need of a written agreement to do that which he has done is dispensed with and the relation of shareholder exists. (*Shickle* v. *Watts*, 94 Mo. 410, 7 S. W. 274; *Lloyd* v. *Preston*, 146 U. S. 630, 13 Sup. Ct. 131; *Webster* v. *Upton*, 91 U. S. 65.)

Appellant says that plaintiff cannot recover upon the theory that there has been a fraudulent overvaluation of the property, because his cause of action arises out of tort, and not out of contract. This revives the argument already considered and disposed of—that, to recover, plaintiff must show that he relied upon the fraudulent overvaluation of the mine. Counsel overlook the full significance of the language of the statute, whereby the liability exists, not for debts due by the corporation, but for all acts of and contracts made by it. Spelling on Corporations, Section 909, says that damages arising from the commission of torts by a corporation's agent cannot be recovered where the liability is for debts only; but, where the terms "debts" and "liabilities" are used, "the combination seems sufficiently comprehensive to include all acts and species of obligation and wrong for which a civil action would lie, except such as are purely penal in character." "All acts of and contracts by the corporation" are very comprehensive words, and certainly afford no ground whereon the courts can exclude acts of wrong independent of contract. In an early case in New York, *Heacock* v. *Sherman*, 14 Wend. 58, the word "debt" was regarded as limited to claims arising out of contract, but the court was of opinion that the word "demand" by itself would include a claim for damages arising out of the wrong of the corporation. Many statutes imposing this individual liability upon shareholders fix it only for payment of debts contracted by the corporation; but in section 457, as if to overcome the restrictions put upon the meaning

of the term "debt" by the courts, the legislature has avoided the use of any such legal technical word, and extended the liability for all acts of, as well as all contracts by, the company. The statute cannot be evaded. Liability for acts of the corporation plainly includes liability for claims for damages consequent upon torts. (*Powell* v. *Oregonian Railway Co.*, 36 Fed. 726.) Plaintiff, claiming in tort, had to fix his claim as a creditor in order to avail himself of his remedy; hence it was obligatory upon him to first establish his claim against the corporation. We regard the liability of the shareholders under our statutes as secondary, not primary. They cannot be held until it appears that the corporation is insolvent. Thompson on Corporations, Section 3521, writes that regularly the creditor, before invoking the aid of a court of equity, must have exhausted his remedy at law; "and the usual proof of his having done so is the recovery of a judgment, and the return of an execution *nulla bona.* To like effect is Spelling on Corporations, Section 904. This appears to us to be just and equitable. (*Powell* v. *Oregonian Railway Co.*, *supra.*)

What we have already said refutes the final argument of appellant—that; if plaintiff relies upon the statutes, his action is upon a liability created by statute; hence his remedy is barred by the statute of limitations. (Compiled Statutes of 1887, Section 42, First Div., and Laws of 1893, page 50.) Respondent was injured May 26, 1891. He recovered a judgment June 28, 1894, and instituted this action August 13, 1894. When plaintiff sued for damages for his injuries, he sued the company. His claim was thereafter merged in a judgment against the corporation. Now, as a judgment creditor, he is suing other defendants—individual stockholders—to make them pay the amount of his judgment. But, as the shareholders are only secondarily liable, they could not have been proceeded against on an unliquidated demand until the judgment against the corporation was taken, or the demand was liquidated, and the company was insolvent. (*Powell* v. *Oregonian Railway Co.*, *supra.*) The better rule in such cases is that no cause of action accrues against the shareholder

until the creditor has failed to make the amount of his judgment or ascertained claim from the assets of the company, or unless, perhaps, in certain cases, it appears to be useless to proceed against the corporation. (*Hawkins* v. *Glenn*, 131 U. S. 319, 9 Sup. Ct. 739; *Scoville* v. *Thayer*, 105 U. S. 143.)

Several minor errors are assigned. They have been attentively examined, but are not well founded, and require no discussion.

The conclusions we have reached in this case are in accord with those bolder interpretations which uphold, rather than impair, the letter of the constitution and the laws of the state. Enforcement of the liability in this, the first action brought before this court involving the important questions considered and determined, may be a hardship; yet the policy upon which the statutes are founded is most wholesome. In the course of the history of the state, the maintenance of those principles which we have followed will intercept the further growth of a system by which "wildcat" corporations have done grievous wrong to the public generally.

The law has said to the incorporators of mines: "You must not issue as paid in more stock in exchange for property taken than will fairly represent what the property is worth. It thus exacts no more from you than it does from the incorporators of manufacturing schemes. You must be fair and honest in valuing your mining properties, so that your capital stock may be assumed to represent what is actually paid in. It requires no impossibilities from you, but it insists on identically the same good faith from you as a miner that it calls for from your neighbor as a manufacturer. By obeying its commands, you are perfectly free from individual liability; but, by palpably and advisedly evading them, you run the risks consequent upon your evasion."

The judgment and order appealed from are affirmed.

*Affirmed.*

PEMBERTON, C. J., and PIGOTT, J., concur.